81 A.3d 24

**CITY OF PHILADELPHIA, Trustee under the will of Stephen Girard, Deceased, acting by the Board of Directors of City Trusts, Appellant**

v.

**CUMBERLAND COUNTY BOARD OF ASSESSMENT APPEALS, Appellee.**

Supreme Court of Pennsylvania.

Argued May 9, 2012.

Decided Oct. 30, 2013.

582

Sarah Chadwick Cocke, Esq., PFM Group, for Public Financial Management, Inc.

James G. Colins, Esq., Stephen A. Cozen, Esq., Sara Anderson Frey, Esq., Cozen O'Connor, Philadelphia, Gary Dean Fry, Esq., Archer & Greiner, P.C., Philadelphia, Christopher Anil Amar, Esq., Charles B. Gibbons, Esq., Pittsburgh, Jack Mentzer Stover, Esq., Harrisburg, Buchanan Ingersoll & Rooney, P.C., Joseph T. Kelley Jr., Esq., Kelley & Murphy, Howard A. Rosenthal, Esq., for City of Philadelphia, Trustee Under the Will of S. Girard, Deceased, Acting by the Brd of Drectors.

Stephen Douglas Tiley, Esq., Frey & Tiley, Carlisle, for Cumberland County Board of Assessment Appeals.

Robert L. Knupp, Esq., Knupp Law Offices, LLC, Anthony T. McBeth, Esq., Harrisburg, for County Commissioners Association of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.

The issue in this appeal is whether certain property (the "property") in Cumberland County, which is owned by the City of Philadelphia as trustee of the Stephen Girard Trust and leased by the Board of Directors of City Trusts (colloquially and hereinafter "the Board of City Trusts" and,

where the context is clear, "the Board") to the Pennsylvania Office of Attorney General ("OAG"), is subject to local real estate taxation in Cumberland County. The trial court held, in a grant of summary judgment, that the property was both immune and exempt from local real estate taxation.[1] The Commonwealth Court reversed in a published opinion. For the reasons set forth below, we reverse the Commonwealth Court and reinstate the order of the trial court, on grounds of tax immunity.

## I. Background

Stephen Girard's Will and the entwined nature and status of the Girard entities[2] have produced nearly two centuries of litigation in multiple contexts. Girard was a unique person and the Girard Trust is a unique legal entity. Born in Bordeaux, France, on May 20, 1750, Stephen Girard died on December 26, 1831 at eighty-one years of age; his life reflects

1. This Court has defined the concepts of immunity and exemption from local property taxation as follows: "Tax immunity precludes a locality from imposing taxes upon the Commonwealth and its agencies. Tax exemption, on the other hand, carves out specified property from taxation that the taxing body otherwise has the authority to tax." *Lehigh–Northampton Airport Auth. v. Lehigh County Bd. of Assessment Appeals,* 585 Pa. 657, 889 A.2d 1168, 1172 n. 2 (2005) (internal quotation marks omitted). Practically speaking, if an entity is immune, the taxing authority bears the burden of establishing why taxation is permissible; if the entity is exempt, the entity bears the burden of establishing why it should not be subject to taxation.

2. Collectively, the "Girard entities" are: the Girard Trust, which represents the assets from the Girard Estate that Stephen Girard left in trust to the City of Philadelphia; Girard College, the school envisioned in Girard's will and sustained by the Trust; and the Board of Directors of City Trusts, known colloquially and hereinafter as the Board of City Trusts, which since its creation by the General Assembly in 1869 has administered the Trust and managed the College, with the exception of a ten-year period, discussed *infra.* At times in this Opinion, the entities are addressed individually when the role of one or another entity is at issue; at times they will be addressed collectively when the interconnectedness that characterizes them is at issue. Also in this Opinion, "the Board of City Trusts" (or "Board" where the context is clear) indicates the party appealing to this Court, which is fully designated as the "City of Philadelphia, Trustee Under the Will of Stephen Girard, Deceased, Acting by the [Board of City Trusts]."

the early history of the nation and of his chosen home, Philadelphia, Pennsylvania.[3]

Girard was born into a family that had established a lucrative business trading in the West Indies in the Caribbean Sea; he began working in his father's counting house at ten years old, went to sea for the first time at age fourteen in 1764, and received little if any formal education. Girard left France permanently in 1773 and ultimately settled in Philadelphia in 1777 after several years as a trading sea captain; he became a citizen of Pennsylvania in 1778. During the American Revolution and the years after, he maintained and augmented his growing commercial fortune, becoming a ship owner and builder in 1789. In the following decades, Girard traded within what is now the United States, to ports including Charleston, South Carolina, and New Orleans, Louisiana, and all over the globe: the West Indies, Europe, the Mediterranean, the Baltic and Russia, South America, the East Indies, India, and China. His trading wares included grain, wine, fruit, hemp, iron, coffee, tea, and silk. Anticipating the War of 1812 with England and its likely effect on international maritime commerce, Girard shrewdly reduced his trading activity, liquidated his overseas holdings, collected outstanding foreign debts owed to him, and invested in the First Bank of the United States. Girard became the foremost banker in Philadelphia and the nation when he acquired the bank itself in 1812 after the federal government declined to renew the bank's charter, which expired in 1811, twenty years after its

3. Historical material in this Opinion derives from prior decisions involving Girard's will (including the Pennsylvania Supreme Court opinions in *Soohan v. City of Philadelphia*, 33 Pa. 9 (Pa.1859), *Philadelphia v. Fox*, 64 Pa. 169 (Pa.1870), and two decisions in the 1950s involving Fourteenth Amendment challenges to the College's segregated student body; and multiple 19th century decisions in the U.S. Supreme Court), as well as a narrative by the longtime archivist of the Girard Collection and Archives, which includes Stephen Girard's business and personal papers. *See* Thomas J. DiFilippo, Stephen Girard, the Man, His College and Estate (1999), *available at* http://www.girardweb.com/girard/welcome.htm (last visited Aug. 19, 2013). The chapter on Girard in James D. McCabe, Jr.'s "Great Fortunes and How They Were Made" (E. Hannaford & Co. 1872) has also been a useful resource.

1791 inception at the behest of Alexander Hamilton, the first Secretary of the U.S. Treasury.

Girard's second career as a banker flourished. He served as a primary financier of the nation during the War of 1812 and on the board of the Second Bank of the United States, which was established after the war, in 1816.[4] Having renounced international trade, Girard invested in land, primarily in Philadelphia (including a working farm located on the site of the present-day historic district of Girard Estate in South Philadelphia), but also throughout Pennsylvania and in Kentucky and Louisiana. Some of the Pennsylvania lands Girard acquired, in Columbia County and Schuylkill County (which includes the borough of Girardville, established in 1832), contained abundant coal; after Girard's death, coal royalties produced hundreds of thousands of dollars each year, sustaining the Trust in the process.

Girard's endeavors were not limited to private enterprise; he was also a selfless public citizen of Philadelphia. The Pennsylvania Supreme Court described his public service over a century and a half ago in *Soohan v. City of Philadelphia*, 33 Pa. 9, 1859 WL 8661 (Pa.1859):

In the great yellow fever of 1793, which broke out in Water street, within a square of his residence, Mr. Girard distinguished himself by visiting and attending upon the sick, and by his invaluable services as an active manager of the hospital at Bush Hill.

Seventeen thousand persons left the city, and of the remainder, upwards of four thousand, or nearly a fifth, died. At a meeting of the citizens of Philadelphia, the Northern Liberties, and district of Southwark, assembled on Saturday, the 22nd day of March 1794, and presided over by Thomas McKean, a signer of the Declaration of Independence, and then chief justice, and afterwards governor of

4. The Second Bank of the United States existed until 1841, but was debilitated in the early 1830s when President Andrew Jackson, long an opponent, vetoed legislation to renew its charter and subsequently withdrew all federal deposits. In 1836, the bank became a private corporation. It suspended payments in 1839 and was liquidated in 1841.

the state, their most cordial, grateful, and fraternal thanks were presented to their fellow-citizens named in the proceedings, "for their benevolent and patriotic exertions in relieving the miseries of suffering humanity on the late occasion." One of these citizens, thus gratefully remembered, was Stephen Girard, under whose "meritorious exertions and peculiar care," at the Bush Hill hospital, in conjunction with Peter Helm, "every possible comfort was provided for the sick, and decent burial for those whom their efforts could not preserve from the ravages of the prevailing distemper."

In 1797 and 1798, the fever again prevailed in Philadelphia with fearful violence, and again Mr. Girard exhibited the same enlarged philanthropy, and the same disregard of danger, by liberal contributions, and personal services to the sick and dying.

In 1802, Mr. Girard was elected a member of the city councils, and so continued for several years. Upon the expiration of the charter of the first Bank of the United States, he established his own private bank, in the building occupied by the late national institution, and his first cashier was Mr. George Simpson, the cashier of the late bank. 1859 WL 8661, at *9–10.

At the time of Girard's death in 1831, his estate was valued at nearly $7 million, making him (it is believed) the wealthiest man in the nation at that time. The estate included ships, land, stock in the public debts of Philadelphia, Pennsylvania and the United States, and shares in insurance companies, Pennsylvania turnpikes and a bridge, the Franklin Institute, the Schuylkill Navigation Company, the Chesapeake and Delaware Canal, and the Danville & Pottsville Railroad.

Girard married, but outlived his wife and had no surviving children. In 1830, the year before he died, he met with his counsel and created what became his last Will and testament, subject to two later codicils; the Will was reprinted and published in 1874. *See* WILL AND CODICIL OF THE LATE STEPHEN GIRARD, ESQ. (James B. Chandler 1874) ("Girard Will" or "the

Will") (cites *infra* are to specific provisions of the Will, followed by the corresponding page numbers in the published version). The Girard Will left specific sums to relatives, including Girard's brother and each of his brother's six children and four other nieces, as well as bequests to friends, life incomes to his maid and to his farm housekeeper and her family, and bequests to persons indentured to him. The vast majority of his considerable fortune, however, was left to support charitable and public causes in and about Philadelphia. Thus, Girard left sums to Pennsylvania Hospital, asylums for orphans and the deaf and mute, a society for relief of impoverished shipmasters and their families, and amounts to be invested so as to provide housing fuel for the poor of Philadelphia. Girard also left specific bequests to establish a public school in Philadelphia, and a neighborhood school just outside the then-boundaries of the City, in Passyunk Township.[5] Girard Will, Clauses I–XVIII, at 3–14.

5. The City of Philadelphia was not enlarged to become the entire County of Philadelphia (including Passyunk Township) until the Act of Consolidation in 1854; at the time of Girard's death, the city was considerably smaller, encompassing the narrowest point between the Delaware and Schuylkill Rivers. *See Taggart v. Commonwealth*, 102 Pa. 354, 1883 WL 13317, *9 (Pa.1883) ("The first section of the Act of 2d February 1854 extended the boundaries of the city of Philadelphia so as 'to embrace' the whole of the territory of the county of Philadelphia."). In a legal challenge to Girard's Will premised upon the alteration and enlargement of the City effected by the Act of Consolidation, the U.S. Supreme Court in *Girard v. City of Philadelphia*, 7 Wall. 1, 74 U.S. 1, 19 L.Ed. 53, 1868 WL 11147 (1868), described the City's growth, as follows:

> The city of Philadelphia, as originally laid out in 1683, and as incorporated in 1701, was situated upon a rectangular plot of ground, bounded in one direction by two streets called Vine and South, a mile apart, and in the other by two rivers (the Delaware and Schuylkill), two miles apart; the corporate title of the city being "the Mayor, Aldermen, and Citizens of Philadelphia." Upon the neck of land above described the corporate city continued to be contained until 1854; the inhabitants outside or adjoining it being incorporated at different times, and as their numbers extended, into bodies politic, under different names, by the State legislature, and with the city, forming the county of Philadelphia. In 1798, the Revolution having dissolved the old corporation, the legislature incorporated the city with larger powers; and prior to 1854, nearly twenty acts had been passed altering that law, and forming, the whole of them, what was

The residual portion and great majority of Girard's estate, estimated to be worth about $5 million at the time of his death, was also left to further public purposes in the city he called home. The Will stated plainly: "I have sincerely at heart the welfare of the City of Philadelphia." Girard Will, Clause XX, at 18. The directives Girard included in his Will corroborated this point. Thus, Girard left $500,000 to the "Mayor, Aldermen, and Citizens" of Philadelphia to remove and to prohibit all buildings made of wood or other combustible materials in the city and to create Delaware Avenue in place of the former Water Street, where Girard had kept his riverfront offices, so as to improve the eastern half of the City. His specifications for these public improvements were set forth in minute detail. Girard explained that by all of these improvements, "it is my intention to place and maintain the section of the City, above referred to, in a condition which will correspond better with the general cleanliness and appearance of the whole City, and be more consistent with the safety, health, and comfort of the Citizens." Girard Will, Clause XXII, ¶¶ 1–3, at 35–40.

Girard also left $300,000 to the Commonwealth of Pennsylvania to improve canal navigation and to enact laws that would permit Philadelphia to improve its port. Notably, each of these civic bequests was conditioned upon the passage of the laws necessary to enable completion of the public projects Girard envisioned. Girard Will, Clause XXIII, at 40–41. The remainder of Girard's fortune was left to the City in trust with instructions to establish, build, and maintain a residential school for "poor male white orphans"—Girard College—on a large lot Girard owned, with the cost of construction not to exceed $2 million. Girard Will, Clause XXI, at 20. However, the residuary portion of the estate was also to be used for other civic purposes, i.e., to provide a competent police force for the City and to improve the property and general appearance of the City. Girard noted that his intention in this regard

popularly called the charter of the city; but as already said, from 1683 to 1854, the city limits were the same.

Id. at *1 (syllabus).

was "in effect to diminish the burden of taxation, now most oppressive especially on those, who are the least able to bear it." Girard Will, Clause XXIV, at 41–42.

Girard's Will made clear that the civic endeavors to be funded from the residuary estate were subject to the "primary object" that the College be adequately provided for. He expressed this context for the residuary bequests as follows: "To all which objects, the prosperity of the City, and the health and comfort of its inhabitants, I devote the said fund as aforesaid, and direct the income thereof to be applied yearly and every year for ever—after providing for the College as hereinbefore directed, as my primary object." Girard also provided for public-works contingencies if his designated trustee, the City, were to "knowingly and willfully violate" any conditions of the Will: in that instance, the remainder of the residue would be distributed to the Commonwealth for purposes of internal navigation—excepting that income from his Pennsylvania real estate was to be forever applied to maintenance of the College. If the Commonwealth, in turn, failed to abide by the contingent restrictions placed upon it, the Will further provided, that portion of the remainder of the Estate was left to the United States for purposes of internal navigation. Girard Will, Clause 24, ¶ 3, at 42–43.

Respecting the purpose of the College, Girard made clear that he desired to provide "a better education as well as a more comfortable maintenance" than such orphans "usually receive from the application of the public funds." The Will is replete with meticulous detail concerning the College, which Girard envisioned as an institution able to step in where public assistance had not, or could not. Girard noted, for example, that preference was to be given first to Philadelphia-born orphans, then to those born elsewhere in Pennsylvania, then to those born in New York City, and finally to those born in New Orleans.[6] The Will also addressed the design of the buildings,

6. At his death in 1831, Girard owned nearly 300,000 acres of land in Louisiana and about thirty slaves; these were left in Clause XIX of his Will to the City of New Orleans, which today has both a Stephen Girard Street and a Stephen Girard Avenue.

food and clothing for the students, exercise and recreation, the subjects to be taught, *etc.* Girard Will, Clauses XX; XXI, including ¶¶ 6 & 7, at 18–31.

In addition to designating the City as Trustee of the College, Girard's Will obliged the City and the Commonwealth, if they were to accept his generosity, to pass the laws necessary to effectuate his various bequests. Thus, respecting the bequests to improve the City's physical infrastructure, the Will stated that funds would be disbursed: "as soon as such laws shall have been enacted by the constituted authorities of the said Commonwealth as shall be necessary, and amply sufficient to carry into effect, or to enable the constituted authorities of the City of Philadelphia to carry into effect, the several improvements above specified[.]" Girard directed that the legislation was to be passed expediently, within one year, or the funds would be redirected. Girard Will, Clause XXIII, at 40–41. Both the City and the Commonwealth responded quickly; indeed, within three months of Girard's death, the General Assembly adopted special legislation in the form of the Act of March 24, 1832, P.L. 176, which authorized and directed the City of Philadelphia to carry the Will into effect.[7] Less than two weeks later, by the Act of April 4, 1832, P.L. 275, the General Assembly authorized the select and common councils of the City to provide for the election or appointment of such officers as deemed essential to duly execute "the duties and trusts enjoined and created by" Girard's Will. In *Commonwealth v. Brown,* 392 F.2d 120 (3d Cir.1968), *cert. denied,* 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968), the U.S. Court of Appeals for the Third Circuit described some of the ensuing developments:

**7.** The Pennsylvania Constitution in effect at the time, the Constitution of 1790, did not contain a proscription against special laws. That limitation was first adopted in the Constitution of 1874, and is found in the current Constitution in Article III, Section 32. *See Pennsylvania Turnpike Comm'n v. Commonwealth,* 587 Pa. 347, 899 A.2d 1085, 1094 (2006) (describing history and noting that "main purpose" of special law restriction was to " 'put an end to the flood of privileged legislation for particular localities and for private purposes, which was common in 1873' "; and quoting *Haverford Township v. Siegle,* 346 Pa. 1, 28 A.2d 786, 788 (1942)).

Philadelphia accepted the bequests and by ordinance set up a plan to administer the College by a Trusts Board. In 1833 a building committee of the City Council was appointed, a president of the College was chosen under an ordinance created for that purpose and the cornerstone of the main building laid. Construction was concluded in 1847 and the College opened the first of the following year. Down to 1869 the City Council operated the College directly, first by way of the trustees until 1851 when the latter offices were abolished, and the Council again took over direct management. In 1869 the Commonwealth enacted a law which gave Philadelphia a local Board of Trusts to take over the control of Girard College.... Broadly summing up the Commonwealth and City's intimate association with Girard College the District Court, with full justification in the record, found as fact that:

> Beginning in 1831 and continuing to date [1968], the Commonwealth of Pennsylvania and the City of Philadelphia, by the enactment of statutes and ordinances, by the use and supervision of public officials, appointed by legislative and judicial bodies, by rendering services and providing tax exemptions, perpetual existence and exemption from tort liability have given aid, assistance, direction and involvement to the construction, maintenance, operation and policies of Girard College.

*Id.* at 121.

When the College opened in 1848 it housed approximately 200 orphan students who were about eight years old, under the aegis of the City Council. Notably, prior to that time, the City had made use of Girard's residuary bequest to support the other public endeavors which Girard had subsidized in his Will "to diminish the burden of taxation, now most oppressive especially on those, who are the least able to bear it." Thus, as the *Soohan* Court noted: "Until 1847, annual appropriations were made out of the residuary estate, for the support of the police, the improvement of the city property, and the general appearance of the city, and in effect to diminish the burden of taxation, but they ceased of course with the comple-

tion of the college—the erection of which had entirely exhausted the special fund of two millions." 1859 WL 8661, at *14.[8]

Additional special legislation was adopted to satisfy other stipulations in Girard's Will respecting the College and obligations placed upon the City as his trustee. For example, the Will required that the City or its appointees be authorized to ensure that an orphan's relatives could not interfere with or withdraw a child from the College once the child was admitted, while another paragraph in the same Clause provided that when orphan students arrived at ages 14–18, they were to be "bound out" by the City to various "suitable occupations." Girard Will, Clause XXI, ¶¶ 5 & 9, at 30, 32. The General Assembly responded in 1847, passing a "Special Act"[9] by which guardians of prospective Girard College orphans were authorized to bind such children by indenture, as the Will indicated, to the City as trustee, effectively making the City the guardian of every Girard College orphan, prohibiting interference by the child's relatives, and authorizing the City to bind the students out until they reached their majority. *See Soohan,* 1859 WL 8661, at *1–2, *14; *see also In re Estate of Girard,* 386 Pa. 548, 127 A.2d 287, 321–22 (1956) (Musmanno, J., dissenting) (describing state and local implementing legislation; noting that "between September 15, 1832 and December 18, 1869, the Council enacted 48 different ordinances devoted exclusively to the Girard College").

In March 1869, the General Assembly responded to an apparent crisis in the management of the Trust and College. The Pennsylvania Senate heard testimony and discussed the state of affairs. Under the leadership of the City and Council, as described in the legislative record, "the college, like Noah's ark, has been 'drifting along' and 'tiding along,' without pilot or helmsman, upon the great deep, for a long time past." Pa. Senate Legislative Record, March 31, 1869, at 849–59. The

8. The value of Girard's residuary bequest was diminished significantly by the financial panic of 1837. *In re Estate of Girard,* 386 Pa. 548, 127 A.2d 287, 289 (1956).

9. Act of February 27, 1847, P.L. 178, 53 P.S. §§ 6792–6797. These provisions were ultimately repealed. *See* Act of November 19, 1959, P.L. 1526, § 10.

solution was an Act of June 30, 1869, which ousted the existing directors, removed the Girard Trust assets from the control of the city council, a political body subject to political influences, and created the Board of City Trusts; the legislation is currently at 53 P.S. §§ 16365–16370.[10] The statutes directed that Board of City Trusts members were to be citizens of Philadelphia appointed by a "board of appointment" comprised of "the judges of the supreme court, together with the judges of the district court [since abolished] and the court of common pleas of the city and county of Philadelphia." 53 P.S. § 16366.[11] Board members were to serve indefinitely, "during

10. In addition to Girard's bequest, other trusts administered by the Board of City Trusts have included legacies from Benjamin Franklin, the Freemasons, Mary Shields, who bequeathed $10,000 to the City upon her death in 1880 "to distribute coal to indigent widows, single women and men, without respect to color," and John Scott, a chemist and druggist who left, at his death in 1815, a fund of $4,000, the interest on which would fund awards to "ingenious men and women who make useful inventions." 53 P.S. § 16365 (historical and statutory notes). Early Scott awardees invented or improved relatively prosaic items characteristic of the Industrial Revolution: the washing machine, the cash register, the chemical fire extinguisher, and the typewriter; in 1889, Thomas Edison won for his invention of the mimeograph. Since then, a number of recipients have been scientists of world renown, including a number of Nobel laureates. These include physicist Marie Curie (1921), aviation pioneer Orville Wright (1925), Thomas Edison (who won again in 1929), radio pioneer Guglielmo Marconi (1931), electricity innovator Nikola Tesla (1934), penicillin discoverer Alexander Fleming (1944), nuclear chemist and Manhattan Project participant Glenn Seaborg (1952), John Bardeen (1954), who won the Nobel Prize in Physics twice (for development of transistor technology in 1956 and again in 1972 for work on the theory of superconductivity), polio vaccine discoverer Jonas Salk (1957), and internet technology pioneer David J. Farber (1996). The 2011 recipients were neurochemist David E. Kuhl and cancer researcher Jenny P. Glusker; and the 2012 recipients were physicist Paul J. Steinhardt and medical researchers Dr. John Q. Trojanowski & Dr. Virginia Man–Yee Lee. See http://www.garfield. library.upenn.edu/johnscottaward(full).html (last visited Aug. 19, 2013).

11. Later legislation and constitutional amendment vested the power of appointment exclusively in the judges of the Court of Common Pleas of Philadelphia County. Article V, Section 21 of the 1874 Pennsylvania Constitution stated that the appointment powers of Supreme Court justices were to be limited; and the Act of May 25, 1874, P.L. 228, provided that pursuant to the Constitution's "disqualification" of Supreme Court justices from appointment of, inter alia, directors of public boards, such as the Board of City Trusts, such appointments were to be made, going forward, by county courts of common pleas.

good behavior," but could be removed by two-thirds agreement of the judicial board of appointment. 53 P.S. § 16366.

As a result of administration of the Trust being left to the City, changes in the City itself as reflected in the 1854 Act of Consolidation, and then changes in the administration of the Trust, as effected by the 1869 Act, extensive litigation involving the Girard entities ensued during the nineteenth century. In 1956, this Court summarized the nineteenth century litigation in *In re Estate of Girard, supra*, as follows:

The Supreme Court held in *Vidal v. Girard's Executors*, 2 How. 127, 43 U.S. 127, 11 L.Ed. 205 [ (1844) ], in an elaborate opinion by Mr. Justice Story, that the city was legally capable of taking the bequest of the estate for the erection and support of the college upon the trusts designated in the will, and that these were valid charitable trusts and capable of being carried into legal effect.

In *Girard v. City of Philadelphia*, 7 Wall. 1, 74 U.S. 1, 19 L.Ed. 53 [ (1868) ], the decision in the *Vidal* case was affirmed, and it was held that the Consolidation Act had not changed the identity of the city so as to affect in any way its administration of the trust. The Court stated . . .: "Now, if this were true, [that the city had become unable to administer the trust] the only consequence would be, not that the charities or trust should fail, but that the chancellor should substitute another trustee." In *City of Philadelphia v. Heirs of Stephen Girard*, 45 Pa. 9 [ (Pa.1863) ], our own Court likewise held that the trusts created in the will were valid, and pointed out that the distinction must carefully be observed between the purposes and provisions of the trust itself and any problems or difficulties arising from the mode of its administration, the former not being affected by the latter; attention was called to the important fact that Girard stated that it was his "primary object" to construct and maintain the college. In *City of Philadelphia v. Fox*, 64 Pa. 169 [ (Pa. 1870) ], it was once again held that Philadelphia could act as a trustee to carry out the trusts under Girard's will, and that the Act of June 30, 1869, P.L. 1276, 53 P.S. §§ 6481–6486, providing for the administration by a Board

of Directors of City Trusts of the trusts confided to the city, the Board being "dissociated from the general government of the city," was a valid enactment. And finally, in *Girard's Appeal*, 4 Penny[p]. 347 [ (Pa.1880) ], dealing with another attack on the will by Girard's heirs, it was held that they were concluded by the decree of the United States Supreme Court in the *Vidal* case, and that the establishment of the Board of Directors of City Trusts was legal and proper. . . .
*Id.* at 290.

The 1870 decision in *Philadelphia v. Fox*, 64 Pa. at 169, is of particular interest to the inquiry before us. The challenge in *Fox*, by the City through its Solicitor (Mayor Daniel M. Fox and City Council were the ostensible defendants), was to the power of the General Assembly to replace the City as Trustee with the Board of City Trusts, a new municipal entity of the Legislature's creation that was "dissociated from the general government of the city." 1870 WL 8678, at *13. The *Fox* Court held the legislation to be constitutional, emphasizing that whatever power the City exercised over the Girard assets as trustee was revocable and subject to alteration, modification, and even dissolution by the sovereign Commonwealth, which was empowered to create municipal corporations like the City, as well as boards of municipal sewerage, streets, and police, in much the same manner as it had created the Board of City Trusts. And, if the Legislature could vest power in a municipal corporation, the Legislature could also remove or reshape that power; as such, any argument that the Commonwealth did not retain sovereign power over the City of Philadelphia and, by extension, the Board and the Girard entities, would fail.[12] *Id.; see also Appeal of Girard*, 4 Pennyp. 347,

12. The *Fox* Court's explication of the relationship of the Commonwealth to the City was consistent with the U.S. Supreme Court's interpretation two years earlier in *Girard v. Philadelphia*, 7 Wall. 1, 74 U.S. 1, 19 L.Ed. 53 (1868). In that case, heirs of Stephen Girard claimed in essence that when the Legislature consolidated and expanded the City to encompass the County by the Act of Consolidation of 1854, the original municipal entity responsible for administering the Trust ceased to exist, with the consequence that the assets should revert to Girard's heirs. The High Court disagreed, noting:

1884 WL 13312, *10 (Pa.1880) ("The directors of city trusts are a department of the municipality which the Legislature had a constitutional right to establish. A man who constitutes such a municipality his trustees [sic], does so subject to all the changes which the sovereign power may make in its character and organization.").

Notably, in deciding the issue concerning the authority to shift the trusteeship from the City to the Board of City Trusts, the *Fox* Court also addressed the foundational question of the propriety of a municipal entity undertaking to manage the estate of a private person at all:

> Such a municipal corporation may be a trustee, under the grant or will of an individual or private corporation, but only as it seems for public purposes, germane to its objects. I am aware that it has been said by high authority in England that it may take and hold in trust for purposes altogether private. But the administration of such trusts, and the consequent liabilities incurred, are altogether inconsistent with the public duties imposed upon the municipality.... It certainly is not compellable to execute such trusts, nor does it seem competent to accept and administer them. The trusts held by the city of Philadelphia, which are enumerated in the bill before us, are germane to its objects. They are charities, and all charities are in some sense public. If a trust is for any particular persons, it is not a charity. Indefiniteness is of its essence. The objects to be benefited are strangers to the donor or testator. The widening and improvement of streets and avenues, planting them with ornamental and shade trees, the education of orphans, the

The legislature may alter, modify, or even annul the franchises of a public municipal corporation, although it may not impose burdens on it without its consent. In this case the corporation has assented to accept the changes, assume the burdens, and perform the duties imposed upon it.... If the trust be not rightly administered, the *cestui que trust* [beneficiary], or the sovereign may require the courts to compel a proper execution.... Charity never fails; and it is the right, as well as the duty of the sovereign, by its courts and public officers, as also by legislation (if needed), to have the charities properly administered.

74 U.S. at 15 (citations omitted).

building of school-houses, the assistance and encouragement of young mechanics, rewarding ingenuity in the useful arts, the establishment and support of hospitals, the distribution of soup, bread or fuel to the necessitous, are objects within the general scope and purposes of the municipality. The king himself may be a trustee, though he cannot be reached by the process of any court without his consent ... and so may the state, though as I take it under the Constitution, only for objects germane to the purposes of government.

1870 WL 8678, at *12 (citations omitted).

After 1870, with the validity of the Trust reaffirmed, and more stable governance through the Board of City Trusts and ample revenue from Girard's coal lands and other properties, Girard College flourished. At the turn of the twentieth century, the school had over 1500 students, with hundreds more on a waiting list.

In the mid-twentieth century, however, further litigation arose. In 1954, a lawsuit challenged the racial segregation of the College arising from the Will's stipulation that the pupils be "poor male white orphans," after two otherwise qualified applicants were denied admission by the Board of City Trusts solely on account of their race. The rejected applicants sued, alleging that the race restriction violated the Fourteenth Amendment to the U.S. Constitution. The ensuing legal battle over segregation at Girard College would last over a decade.

The City and the Commonwealth agreed with the applicants, but the Board defended the policy. The Orphans' Court of Philadelphia County rejected the claim, and refused to order that the applicants be admitted. On appeal, the Pennsylvania Supreme Court affirmed in a divided opinion. *In re Estate of Girard*, 386 Pa. 548, 127 A.2d 287 (1956). The majority noted that the Fourteenth Amendment applies only to agencies of the state or municipalities within the state; it is not directed against private, individual actions. The majority then rejected the applicants' claim that state action was implicated in the decisions enforcing the Will's race restriction

because the City was appointed trustee by Girard and had thereafter accepted the duties he imposed and administered the Trust. The majority reasoned, in central part, that:

It is true that Girard appointed the City of Philadelphia as the trustee to administer the trust according to the terms of his will, but he certainly did not intend thereby to empower it to conduct such administration in its *public or governmental capacity*, or to bring into play any of its *proprietary* rights since it is merely the title holder of Girard's property and not its beneficial owner. As a *trustee* it was to act and could act only in a *fiduciary* capacity, exercising no State or governmental function or power in the slightest degree, but being limited to the same rights, powers and duties, no more and no less, as those of any private individual or trust company acting as trustee.... All provisions of the will show that it was not intended to be a public school.... The situation, therefore, is not to be confused with the so-called de-segregation cases which dealt with public schools where no discrimination in respect to race, creed or color, as the United States Supreme Court has decided, is permissible under the Fourteenth Amendment.... The college has been supported and maintained for now over a century by Girard's estate; not a penny of State or city money has ever gone into it; no taxpayer has ever been called upon to contribute to it; true, it is exempt from local taxation, but so are all other charities even though restricted as to their beneficiaries and managed by private trustees.

127 A.2d at 293–94 (footnote omitted). The majority added that, even if the Board of City Trusts were deemed to be engaged in state action, the remedy would not be to strike the racial restriction, but to appoint a different, private trustee. *Id.* at 295–96.

Justice Michael A. Musmanno dissented in a lengthy opinion. After noting the many provisions in the Will designed to improve the City, the dissent opined that "[i]t is difficult to imagine a testamentary disposition more completely interwoven with the public's welfare and responsibilities than the Girard will." The dissent further observed that Girard's

dream of a college for the education of the poor would have "died a-borning without State action," describing the various acts required to be adopted by the General Assembly before many of the testamentary bequests could be made effective. The dissent stressed that the General Assembly "could have refused to accept [Girard's] largesse," but it instead accepted every proposition and condition advanced in his Will. *Id.* at 321–24 (Musmanno, J., dissenting).

The dissent further suggested that the question of whether the Trust was a public institution (and thus subject to the Fourteenth Amendment), in fact was resolved by the *Fox* decision of 1870, in passages that the Court majority had failed to acknowledge when it discussed *Fox.* The dissent stressed the observations in *Fox* that a municipal corporation may act as a trustee under the grant or will of a private individual or corporation "only as it seems for public purposes, germane to its objects." 127 A.2d at 325 (Musmanno, J., dissenting) (quoting *Fox,* 1870 WL 8678, at *12). The dissent also emphasized that, in effectuating his bequests, Girard had called upon the General Assembly, the City Council of Philadelphia, its mayor and its treasurer to implement his intentions; the Commonwealth then "added for his benefit" the services of the Court of Common Pleas in appointing the members of the Board of City Trusts, all in order to effectuate the directives of the Will. *Id.* at 326.

The dissent next addressed the majority's reasoning that Girard's appointment of the City to administer the trust did not mean that he had empowered it "in its public or governmental capacity." The dissent responded, again along the lines of the *Fox* decision: "how else can a City act except in its public or governmental capacity?" *Id.* at 332. The dissent responded to the majority's statement that the City was acting only in a fiduciary capacity by similarly noting that:

The City does not have a fiduciary existence. It has only a municipal existence. The fact that it owns and operates a golf course does not make it a country club; the fact that it stages open air light opera does not make it a recreation park promoter. There is not a private school in the whole

State of Pennsylvania which is controlled and managed by a City or any municipality as is the Girard College.

*Id.* at 332.

Finally, responding to the majority's claim that there was no relevant distinction between Girard College and the smallest of private schools, the dissent rejoined:

The Girard College has a board of directors made up of the Mayor of Philadelphia, the President of City Council, and twelve members appointed by the Courts of Common Pleas. This Board thus represents the body politic, the public, the citizenry of the County of Philadelphia, a sovereign subdivision of the sovereign State. Since our judges are elected by the people, as are the Mayor and President of City Council, the Board of City Trusts is therefore an expression of the people themselves. The private school, on the other hand, is strictly a private commercial enterprise run for profit. The legal principles which control Girard College are separated by a chasm as wide as the constitution itself from a private school owned by private individuals, and run by private individuals, all for the monetary advantage of private individuals. Private schools receive no tax exemption. For that reason alone the legal principles which guide their destiny are quite different from those which apply to Girard College which enjoys a tax exemption annually of $550,700. *In re Ogontz School, Tax Exemption Case,* 361 Pa. 284, 65 A.2d 150 [ (1949) ]. No private school in the State can boast the governmental direction, control, and privileges which are as much a part of Girard College as the buildings themselves.

*Id.* at 332–33.[13]

The applicants sought further review in the U.S. Supreme Court, which summarily reversed and remanded in a unani-

13. The citation to *Ogontz* apparently referenced the following analysis:

In its argument Appellee stresses the fact that the [Ogontz] School was chartered "as a non-profit corporation" and that "no one receives directly or indirectly any profit from the school." These facts do not clothe the School with exemption from taxation. Those who establish and conduct an institution may declare that in doing so they

mous *per curiam* decision. *Commonwealth v. [Board of City Trusts* ], 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957). The High Court noted that Girard's Will named the City as Trustee; that the provisions of the Will were carried out by the Commonwealth and the City; and that "[s]ince 1869, by virtue of an act of the Pennsylvania Legislature, the trust has been administered and the college operated by the 'Board of Directors of City Trusts of the City of Philadelphia.' " *Id.* at 231, 77 S.Ct. 806. On these undisputed facts, the Court held that:

> The Board which operates Girard College is an agency of the State of Pennsylvania. Therefore, even though the Board was acting as a trustee, its refusal to admit [the student applicants] to the college because they were Negroes was discrimination by the State. Such discrimination is forbidden by the Fourteenth Amendment. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 [ (1954) ]. Accordingly, the judgment of the Supreme Court of Pennsylvania is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

353 U.S. at 231, 77 S.Ct. 806.

In turn, the Supreme Court of Pennsylvania remanded to the Orphans' Court, which construed the U.S. Supreme Court's determination as meaning no more than that the Board of City Trusts was constitutionally incapable of administering the College in accordance with Girard's racial restric-

do not intend to make a profit from anyone and they may conduct it without pecuniary profit to anyone, and yet it may not be "an institution of purely public charity." In determining an institution's status in this respect it must be viewed from the standpoint of the public. Can the public look upon Ogontz School as an institution where each year three hundred students or the vast majority of them can obtain lodging, food and instruction for nothing (as, for example, 1800 orphan boys do at Girard College), or for a charge so far below the value of the things they get that what they get are charitable gifts? The answer is, "No." The vast majority of those three hundred students who attend the Ogontz School pay not only for all they get, but they pay for more than they get, at least to an extent sufficient to enable the School to provide what is equivalent to free board, lodging and instruction to about 10% of its students.

*In re Ogontz School*, 361 Pa. 284, 65 A.2d 150, 163–64 (1949).

tion. The lower court's solution was not to admit the applicants, but to remove the Board as trustee of Girard College, as per the alternative *dictum* in the 1956 majority opinion in *In re Estate of Girard,* and to replace the Board with thirteen private citizens who, it was presumed, could enforce the racial restriction in the Will. The applicants again appealed to the Pennsylvania Supreme Court, with the dispositive question being narrowly framed by the Court as "whether the action of the Orphans' Court is consistent with the opinion of the Supreme Court of the United States." *In re Girard College Trusteeship,* 391 Pa. 434, 138 A.2d 844, 846 (1958).

In a 4–1 decision (two Justices did not participate), the Court majority answered that question in the affirmative, reasoning that:

As we read the Supreme Court's opinion, what it holds, and all that it was presumably intended to hold, in view of what was then before the Court, is that the [Board of City Trusts], being a State agency, is incapable of administering Girard College in strict compliance with the founder's prescribed racial restriction on admissions without being guilty of a violation of the Fourteenth Amendment. However, the Supreme Court did not say that there is any Constitutional or other legal barrier to the removal of the Board of City Trusts as trustee of Girard College in order that the Orphanage can be administered in accordance with all of the testator's express directions including the qualifications for admission to the student body. On the other hand, there is high authority for such procedure where a trustee is either unable or fails or refuses to administer a trust in accordance with the lawful directions of the settlor.

*Id.* at 847. The majority added that the "inability" of the Board of City Trusts to "apply constitutionally" the racial criterion in the will "affects *the trustee* and not *the trust.*" In so concluding, the Court majority approved the Orphans' Court's opinion, which had stated: " 'It is a universally accepted rule of law that the disqualification or incompetency of a trustee shall not be permitted to defeat the purposes of a charitable trust, nor to impeach its validity, nor to derogate

from its enforcement—the trustee must be fitted to the trust and not the trust to the trustee.' " *Id.* at 847–48.

Justice Musmanno again dissented, beginning by stressing again the many civic improvements provided for in Girard's Will, and then noting:

It is difficult to visualize the will of a private individual more dedicated to public business than Stephen Girard's. Schools, streets, docks, canals, river distribution, public hospitals, and asylums are items which one finds in the budget of nations, states, and municipal corporations, not private householders. These are matters for the consideration of the State, and indeed the State of Pennsylvania recognized that fact at once.

*Id.* at 855 (Musmanno, J., dissenting). The dissent opined that, "[b]y law and the provisions of the Girard will, the status of Girard College has been one of constant state and municipal responsibility," and added that "[f]or 126 years Girard College has been administered as a public institution by public officials in their public capacities for the benefit of the public." The dissent also questioned the authority of the courts to negate the 1869 Act, which created the Board of City Trusts to manage the Trust and College, as well as the other four statutes and forty-eight City ordinances that had been adopted to address issues specific to the College. The dissent further noted that the City's status as trustee was a specific directive by Girard; and if the City failed to accept the duty, the trusteeship would pass on to the Commonwealth, another public entity. *Id.* at 858.

The dissent supported its point concerning the essentiality of the City's role by quoting Clause XXI, Paragraph 9 of the Will, which noted that Girard left "many details" respecting the College to the Mayor, Aldermen and Citizens of Philadelphia and that he did so with "more confidence" precisely because: "from the nature of my bequests and the benefit to result from them, I trust that my fellow citizens of Philadelphia will observe and evince special care and anxiety in selecting members for their City Councils and other agents." From this language, the dissent concluded that Girard had

made clear that his underlying purpose in creating the Trust was to benefit Philadelphia and its people, and the "best sentinels to stand guard over his bequeathed treasures were the representatives of those who would enjoy his largess." For all of these reasons, the dissent disagreed with the majority's notion that the court could simply substitute private trustees for the public trustee actually named by Girard, particularly where the municipal trustee was capable, competent, and willing to continue acting as trustee. *Id.* at 863–65.

The applicants, again with the concurrence of the Commonwealth and the City, sought a writ of *certiorari*, which was denied. *See Commonwealth v. [Board of City Trusts ]*, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958). However, after more than a decade of litigation and pressure, including an appearance by Rev. Dr. Martin Luther King, Jr. at an August 1965 protest rally, the continuing segregation at the College was finally deemed unconstitutional by the Third Circuit, notwithstanding the state judicial substitution of "private" trustees for the municipal trustee provided for by Girard (and later implemented by the General Assembly by the Act of November 19, 1959, P.L. 1526). *See Commonwealth v. Brown,* 392 F.2d 120, *supra.*

The *Brown* court recounted the relevant provisions of Girard's Will respecting the role of the City as trustee; the City's acceptance of the role; the implementing legislation by the General Assembly; the creation of the Board of City Trusts to manage the Trust in 1869; and the City's successful management of the College up until the ouster of the Board by the Orphans' Court in 1958, and the appointment by that court of trustees of its own selection. At the end of this recitation, the *Brown* court noted the obvious: that "the Orphans' Court of Philadelphia County has been substantially involved with the supervision of the Girard Estate." The *Brown* court further noted that the Board trustees had taken no appeal from their ouster by the Orphans' Court following remand, but instead the appeal was pursued by the child plaintiffs to the Supreme Court of Pennsylvania; that, as we have already noted, our Court affirmed the Orphans' Court's decision to substitute

private trustees in 1958; and that *certiorari* review was sought and denied. *Id.* at 120–23.

In defending against the claim that the continuing segregation of the College violated the Fourteenth Amendment, the court-appointed trustees relied upon, *inter alia,* our Court's 1958 decision. The Third Circuit was unpersuaded:

What the State [Supreme] Court did was turn the matter over to its Orphans' Court which eliminated the City as trustee and installed its own group, sworn to uphold the literal language of the Girard will, a move effectively continuing the very segregation which had been condemned by the United States Supreme Court. True, the latter had denied the application for *certiorari.* Times without number that Court has plainly ruled that there is no inference permissible from its denial of application for *certiorari,* favorable or unfavorable to either side of a litigation. Certainly in the whole muddy situation flowing from the State excision of the City Board, thereby taking away the linchpin of the Girard will, the then existing state litigation picture did not bring into the necessary sharp focus, the set piece maneuver which had completely circumvented the Supreme Court's directive. We, however, as above seen, do have all of that amazing effort to maintain Girard's discriminatory status before us in its true perspective.

*Id.* at 123. The court then stressed the "self-evident" and "close, indispensable relationship" between the College, the City and the Commonwealth "intended by Mr. Girard, meticulously set out in his will and faithfully followed" for 127 years, until the Orphans' Court substituted new trustees of its own choosing. The court further noted that the "ironic result" of the judicial removal of the Board of City Trusts was that Pennsylvania's involvement with Girard College had become more powerful than provided for by Girard, given the role devised and played out by the Orphans' Court. *Id.*

After citing decisions of the U.S. Supreme Court issued before and after this Court's *Girard* decisions in the 1950s— High Court cases that were deemed clearly dispositive of the equal protection question—the *Brown* court noted that the

Girard entities' "definitive position in this period of being more than ever operated by an agency of the state does not simply emanate from the momentum" of legitimate participation by the City and the Commonwealth in the management of the Trust and College over the years. Rather, that position as a state agency also arose as "the obvious net consequence of the displacement of the City Board by the Commonwealth's agent and the filling of the Girard Trusteeships with persons selected by the Commonwealth and committed to upholding the letter of the will," which Pennsylvania state courts enabled in the 1950s. *Id.* at 125. In the *Brown* court's view:

> Those radical changes pushed the College right back into its old and ugly unconstitutional position. Had the City Trustees been left undisturbed it is inconceivable that this bitter dispute before us would not have been long ago lawfully and justly terminated. It is inconceivable that those City Trustees would not have with goodwill opened the College to all qualified children. Given everything we know of Mr. Girard, it is inconceivable that in this changed world he would not be quietly happy that his cherished project had raised its sights with the times and joyfully recognized that all human beings are created equal.

*Id.* at 125.[14]

The U.S. Supreme Court denied *certiorari* in *Brown* in late May of 1968. Within weeks thereafter, the private board of trustees filed a petition in the Orphans' Court to dissolve the private board and restore the responsibility and authority for the Trust and College assets in the Board of City Trusts; the

14. Far less litigious was the school's decision to admit female students in 1982; the first coed class entered in 1984. *See* http://www.girard college.edu/page.cfm?p=358. Also, the school gradually admitted fewer and fewer actual "orphans" in favor of "functional orphans," who were defined as children from inadequate means, regardless of their parental status. *See In re Long's Estate*, 5 Pa. D. & C.3d 602, 614 (Pa.Com.Pl. 1978) (defining "functional orphans" as "boys whose natural parent or parents, in the judgment of the trustee, are not furnishing them proper maintenance, care or supervision, and who, being of good character and behavior, and having the potential for scholastic achievement, would benefit from the programs offered at Girard College...."). By the mid–1980s, all but one of the incoming Girard College class of 77 students were "functional orphans."

first black students entered Girard College that fall. And, one year later, the General Assembly legally restored the Board and, effective immediately, repealed the legislation that had acquiesced in and implemented this Court's 1958 decision allowing for installment of the private board of trustees. *See* Act of July 18, 1969, P.L. 163 (three subsections: section 1 is a positive statement of law effectively returning responsibility for city trusts to the Board of City Trusts; section 2 repeals the 1959 legislation; and section 3 provides for immediate effectiveness); this legislation was originally codified at 20 Pa.C.S.A. § 3301. Section 3301 was repealed by the Act of June 30, 1972, P.L. 508. Concurrently, subsection (1) of 20 Pa.C.S.A. § 3301, the positive statement of law restoring the Board, was enacted, and ultimately became codified at 20 Pa.C.S. § 5116; the provision was amended in 1978 to lower the age at which an "orphan" was no longer subject to or protected by the legislation, from 21 to 18 years of age.[15]

## II. The Litigation Below

The ongoing attempts of the Board of City Trusts to fulfill Girard's vision, maintain the Trust and College, and secure its continuing ability to provide high quality residential and tuition-free education for low-income students, nearly 80% of whom come from Philadelphia, sets the stage for this appeal.

15. The current legislation reads as follows:

Whenever any city of the first class of this Commonwealth shall be charged with the administration of any charitable use or trust for both the maintenance and education of orphans, it shall, without application to any court, act as guardian of the person and estate of each of such orphans, through the same agency that administers the charitable use or trust. In case any such orphan child, at or before the time said city is charged with the administration of such a charitable use or trust, or during the remaining time it acts as guardian of his estate, shall possess or become entitled to any effects or property, the said city shall be entitled, in like manner as other guardians, to demand and receive the same from any person having possession thereof, or owning the same, and to give acquittance therefor; and it shall be the duty of the said city to take care of the same as guardians, and to make the same productive as far as reasonably can be, and to deliver and pay over the same with the increase, less expenditures made in the exercise of a reasonable discretion, to the said orphan, on his attaining the age of 18 years, or to his legal representatives if he shall die before attaining that age.

In November 2001, the Board purchased the Property in Cumberland County's Borough of Lemoyne for nearly $4 million. When it acquired the Property, the Board also acquired a tenant: the OAG had been leasing the building on the Property for office space since 1999; the rent was set at $42,677 per month, or $512,130 per year. The ensuing rental income is used by the Board solely to fund the Trust and maintain the College. In March 2002, the County began billing the Board for real estate taxes of $6,275 and school district taxes of $18,217 on the Property. The Board paid, but sought relief from the taxes, arguing that as an instrumentality of the Commonwealth, it was immune from local real estate taxation; it also asserted that as an agency of the City of Philadelphia, which owns the Property, it is exempt from local real estate taxation because the Property is leased to the OAG for a public purpose. Application for Exemption, 8/28/02. For reasons not disclosed in the record, the matter remained unresolved for five years, during which time the Board continued to pay the annual taxes under protest; the total amount paid was $242,580.

In October 2007, the County's Board of Assessment Appeals ("County") denied the application of the Board of City Trusts, which sought relief from local real estate taxation on the Property, and in November 2007, the Board of City Trusts filed a petition for review with the Cumberland County Court of Common Pleas, which was granted. The County answered in timely fashion, and in April 2010, the Board of City Trusts filed a motion for summary judgment renewing its two alternative arguments: that it is immune from local real estate taxation as a Commonwealth agency and that it is also exempt from local taxation because the Property is used by the OAG for a public purpose. The Board of City Trusts sought a declaration of non-taxability and reimbursement of taxes paid since 2002, which by then exceeded $300,000. In response, the County maintained that neither immunity nor exemption from local real estate taxation was warranted.

After argument, the trial court granted the Board of City Trusts' motion for summary judgment in an order dated July

30, 2010. In an accompanying opinion, the court credited both alternative arguments forwarded by the Board. On the question of tax exemption, which it examined first, the court looked to the common law of trusts, noting that trusts are characterized by a division of legal (trustee) and equitable (beneficiary) interests in trust property. The court found that the Girard Trust is the beneficiary of the rental income generated by the property, the City is trustee and holds legal title, and the Board is a Commonwealth agency acting on behalf of the City as administrator of the Property. The court stated that because the City holds clear legal title to the Property, it is "public property." The court added that because the Property is rented to the OAG, it is "public property used for public purposes" and exempt from local real estate taxation under the Pennsylvania Constitution and the County Assessment Law.[16] The key indicator, the court continued, was not that the Property generated rental income, but that the "primary use of the Property is office space for the Attorney General which is clearly public in nature." Trial Ct. Op., 7/28/10, at 5–7.

On the question of immunity from taxation, the court concluded that the Board of City Trusts properly could assert immunity as a Commonwealth agency. The court acknowledged the "long and colorful history" of the Girard Trust, and the difficulty courts have had in ascertaining the precise nature of the Board. The court looked first to the entity's enabling legislation of 1869. Although the statute did not expressly state that the Board was a Commonwealth agency, in the court's view, the statutory scheme revealed a legislative intent that the Board exercise "some governmental function" by stepping into the shoes of the City to administer property

---

**16.** PA. CONST. art. VIII, § 2(a)(iii) ("The General Assembly may by law exempt from taxation ... [t]hat portion of public property which is actually and regularly used for public purposes...."); 72 P.S. § 5020–204(a)(7) ("The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit: ... All other public property used for public purposes ... nor shall this act or any other act be construed to exempt from taxation any privilege, act or transaction conducted upon public property by persons or entities which would be taxable if conducted upon nonpublic property regardless of the purpose or purposes for which such activity occurs, even if conducted as agent for or lessee of any public authority....").

held by the City in trust. The court then cited the U.S. Supreme Court's 1957 finding in *Commonwealth v. [Board of City Trusts* ] that "the Board which operates Girard College is an agency of the Commonwealth." The court added that other courts have recognized the Board as a Commonwealth agency in various contexts. For example, the Commonwealth Court held in *Moore v. [Board of City Trusts* ], 809 A.2d 420 (Pa.Cmwlth.2001), that the Board may claim sovereign immunity from negligence causes of action. Even more emphatic, according to the trial court, was the Third Circuit's 1968 desegregation decision in *Brown,* which is discussed above. The trial court stressed that the *Brown* court found multiple ties and links between the Board and various Commonwealth agencies and entities, emphasized Commonwealth control through the statutory supervision and reporting requirements to which the Board of City Trusts is subject, and specified tax exemptions as one of the probable goals of the "special relationship" between the Board and the Commonwealth that Girard's Will contemplated. The trial court also found it compelling that other counties had agreed or accepted that Board-administered property is immune or exempt from local real estate taxation. The trial court thus concluded that the Board is a Commonwealth agency and, as a matter of law, is immune (as well as exempt) from local real estate taxation. Trial Ct. Op., 7/28/10, at 7–10.

On appeal by the County, a Commonwealth Court panel reversed in a published opinion. *City of Philadelphia v. Cumberland Cty. Bd. of Assessment Appeals,* 18 A.3d 421 (Pa.Cmwlth.2011). Like the trial court, the panel traced the difficulty courts have had in pinpointing the legal status of the College and the Board of City Trusts. The panel declined to hold that either the Girard Trust or the Board is a Commonwealth agency merely because the manner of selection of Board of City Trusts members was provided for by the General Assembly. The panel decided that it is the nature of a trust, and not the manner in which its trustees are installed, that determines proper classification. The panel also concluded that although the legislative scheme creating the Board

ensured annual reporting to the General Assembly, the Board members otherwise have no duty to or ongoing functional relationship with the Commonwealth, and other than creating the Board, the General Assembly has no oversight or say in how the Board operates and conducts its affairs, carries out the intentions of Girard's Will, and supports and sustains the Trust and College. 18 A.3d at 426–27.

Nor, according to the panel, are the Board of City Trusts or the Girard Trust local agencies of the City of Philadelphia, since those entities would have to have been the creation of the City and be subject to City oversight, laws, and officials, which they are not. Aside from annual reporting, the panel stated, the Board operates independently of and without compensation from the City, even though the City is legally the trustee of the Girard Trust. According to the panel, because the Trust and the Board are neither Commonwealth nor City agencies, they must be private entities and there is therefore no basis for immunity from local real estate taxation. In support of this reasoning, the panel cited generally to the analysis and "last pronouncement" of this Court, in the second of the desegregation cases decided in the 1950s, stating that the Girard Trust was a private, not a public charity. *See id.* at 427–28 (describing *In re Girard College Trusteeship*, 391 Pa. 434, 138 A.2d 844 (1958)).

The panel then turned to the question of whether the Property is exempt from local real estate taxation because the Trust and the Board of City Trusts are components of an institution of purely public charity consonant with the Institutions of Purely Public Charity Act of 1997. *See* 10 P.S. § 376. The statutory criteria for determining purely public charity status include fulfilling a charitable purpose, an entirely nonprofit motive, gratuitous provision of services or products to legitimate subjects of charity, and that the entity seeking exemption relieves the government of some burden, such as public education. The panel concluded that the Trust, as owner of the Property, qualifies as a purely public charity, but noted that even a purely public charity must ensure that its property is actually and regularly used to advance the institu-

tion's charitable purpose in order to maintain eligibility for the statutory exemption. 18 A.3d at 428–29.

According to the panel, the Board's leasing of the Property to the OAG in order to generate income for the Trust was not a legitimate basis for tax exemption. The panel looked to a test articulated in *Appeal of Archdiocese of Philadelphia*, 151 Pa.Cmwlth. 480, 617 A.2d 821, 823 (1992), which required proof: "(1) that the premises are not the source 'from which any income or revenue is derived' by the Lessor [here, the Board of City Trusts]; (2) that any rent paid was merely nominal; and (3) that the Lessee [here, the OAG] was itself the recipient of the Lessor's charity." To the panel, because the property arrangement here did not meet those criteria, exemption was not warranted. 18 A.3d at 429.

In a footnote, the panel added that even if the Girard Trust is a local agency of the City of Philadelphia, the arrangement at issue—rental of the Property to generate income to fund the College—did not amount to "public property used for public purposes." Even though the OAG is a Commonwealth agency, the panel found that the nature of the tenant did not alter the non-public essence of the underlying arrangement. *Id.* at 429 n. 15. The Commonwealth Court denied the Board's application for reargument.

The City, as Girard trustee acting through the Board of City Trusts, filed a petition seeking discretionary review in this Court, which we granted, accepting the twin issues of immunity and exemption, as stated in the petition:

(1) Is the [Board of City Trusts], created in 1869 by the Pennsylvania Legislature to exercise and discharge duties and powers of the City of Philadelphia, a governmental agency as the United States Supreme Court and numerous federal and state court decisions have previously held, and thus entitled to immunity from local taxes?

(2) Is the property at issue, title to which is held by the City of Philadelphia, administered by the [Board of City

Trusts] and leased to the [OAG], exempt from local property taxation as public property used for a public purpose? 612 Pa. 481, 31 A.3d 654 (2011).

 The question of whether summary judgment is warranted is one of law, and thus our standard of review is *de novo* and our scope of review is plenary. Summary judgment may be entered only where the record demonstrates that there remain no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law. *Chepkevich v. Hidden Valley Resort, L.P.*, 607 Pa. 1, 2 A.3d 1174, 1182 (2010). This Court's inquiry is therefore confined to whether the Girard entities are entitled to judgment as a matter of law, *i.e.*, whether the Property is either immune to, or exempt from, local real estate taxation.

### III. The Parties' Arguments

The parties proceed with arguments tracking those made below. On immunity, the Board of City Trusts notes that, even before it came into existence, the General Assembly had recognized and intended that management of the Girard assets was to be a public and governmental endeavor powered by state legislation, beginning with General Assembly legislation enacted within months after Girard's death that enabled the directives of his Will to take effect under City control. When the City's initial approach to administering the Trust faltered and the College suffered, as we have detailed in Part I above, the General Assembly stepped in again and by the Act of June 30, 1869, created the Board of City Trusts and vested it with broad rights and powers to perform its work on behalf of the City, subject to annual reporting to both the General Assembly and the Philadelphia City Council. Board of City Trusts Brief at 8–11.

The Board avers that the plain language of its enabling legislation reflects its status as an "alter ego" of the City, as it is specifically granted all of the "duties, rights, and powers" necessary to administer all charitable assets vested in the City, including the specific power to "make all leases, con-

tracts and agreements whatsoever" that may be necessary to do so. The Board posits that it was acting within its capacity as a special government agency undertaking a statutorily authorized activity, as well as carrying out the terms of Girard's Will, when it merely leased a City-owned property and managed the ensuing rental income for the benefit and continued endowment and maintenance of Girard College. The Board adds that transcripts of the General Assembly debate preceding adoption of the 1869 Act that created the Board reveal that the goal was to remove management of the Girard assets from City appointees, who had succumbed to political corruption and mismanagement, and place authority instead, including appointment power, in the hands of Commonwealth judicial officials. It was believed, the Board relates, that Commonwealth personnel would be less likely to allow the Girard entities to fall victim to local City influence peddling, to the detriment of the Trust assets. The Board remarks that its composition remains subject to Commonwealth control because the judges of the Court of Common Pleas of Philadelphia County maintain statutory authority over appointment, approval, and removal of Board members, as set forth in 53 P.S. §§ 16365–16370. Board of City Trusts Brief at 11–14.

Next, the Board of City Trusts points to decisions from the U.S. Supreme Court, the Third Circuit, and the Commonwealth Court that have treated it as a Commonwealth agency. Most notably, the Board quotes the High Court's 1957 *per curiam* reversal of this Court's initial desegregation decision. After noting that Girard's Will named the City as trustee, the Board stresses that the pertinent provisions of the Will were, in fact, carried out by the City and the Commonwealth, that the Board had administered the Trust and College since 1869 by virtue of an Act of the General Assembly, and that the High Court held that: "the Board which operates Girard College is an agency of the State of Pennsylvania." *Commonwealth v. [Board of City Trusts]*, 353 U.S. at 231, 77 S.Ct. 806. The Board also cites the 1968 *Brown* case, where the Third Circuit noted that Girard "deliberately and specially involved

the State in the designated use of his testamentary property," as well as the Commonwealth Court's Board of City Trusts sovereign immunity decision in *Moore.* Board of City Trusts Brief at 15–18.

As a practical matter, the Board continues, the negative impact of a first-time determination that Girard Trust-owned property is subject to local property taxation will be substantial and will fall upon entities that serve the public in numerous ways. The Board notes that an estimated $110 million in tax-exempt bonds were issued in reliance upon the status of the Board as a governmental entity pursuant to the federal Internal Revenue Code. This agency status has also been accepted by the Internal Revenue Service ("IRS"). According to the Board, upholding the decision below could lead to mandatory redemption obligations, termination fees, and conversion to private activity bonds subject to taxation, all of which would undermine the financial capacity and capability of the Girard entities.[17] The Board adds that its employees, as well as employees of Girard College and other associated entities have long been deemed to be public employees subject to Pennsylvania's Public Employee Relations Act. If the Board is now held not to be a governmental agency, the labor relations and practices governing the Girard entities will be rendered unstable during a very difficult economic situation. And, if Board-managed property is deemed subject to local real estate taxation in Cumberland County, the Board expects that all similar property, wherever located in the Commonwealth, will almost surely be taxed as well, posing a danger to the Trust funds currently devoted solely to operating and sustaining the College in fulfillment of Stephen Girard's testamentary wishes and instructions. Board of City Trusts Brief at 18–20.

Under trust law as well, the Board of City Trusts adds, the Girard Trust is not private, but a public nonprofit charitable entity created by Stephen Girard's Will as an educational

---

**17.** The *amicus* brief filed by Public Financial Management, Inc., in support of the Board of City Trusts, which is summarized *infra,* provides greater detail on this argument.

resource to help lift disadvantaged children of the City and Commonwealth out of poverty, while relieving some of the public burden of educating those very same children. The Board heralds Girard's bequest as providing that future needy individuals—eligible students not designated, named, or identified in the Will itself—would receive a quality education fully funded by scholarship, which continues to benefit the community and the public. The Board cites as support the Restatement (Third) of Trusts (2003), which distinguishes public and charitable trust purposes, in part, as those created for the benefit of the public at large or "indefinite members thereof," whereas private trusts benefit "identified or identifiable beneficiaries." According to the Board, the Girard Trust is clearly a public charity and continued immunity from local real estate taxation is therefore warranted. Board of City Trusts Brief at 20–24 (citing Restatement (Third) of Trusts (2003), §§ 27, 28 & cmts.).

Finally, turning to tax exemption, the Board alternatively asserts that the "public property/public purpose" exemption set forth in the Pennsylvania Constitution at Article VIII, § 2(a)(iii) and the General County Assessment Law at 72 P.S. § 5020–204(a)(7) applies here. The Board cites cases where this Court has indicated that this particular exemption is not negated when a property generates rental income, so long as the purpose and character of the use remains public in nature. Board of City Trusts Brief at 24 (citing *Appeal of Twp. of Moon*, 387 Pa. 144, 127 A.2d 361 (956) and *Appeal of Mun. Auth. of Borough of West View*, 381 Pa. 416, 113 A.2d 307 (1955)). The Board also cites Commonwealth Court cases holding that property leased to various agencies and governmental bodies, both federal and Commonwealth, has been deemed exempt, such as *Dauphin County General Authority v. Dauphin County Board of Assessments*, 768 A.2d 895, 899 (Pa.Cmwlth.2000) ("[B]oth properties acquired by the Authority ... are used exclusively for public purposes, namely, to house federal and Commonwealth agencies and offices. Hence, both properties are exempt from taxation."). The Board asserts that the Property, which is leased to OAG, is no

different. As such, the Board concludes, the Property falls squarely within the public property/public purpose exemption from local real estate taxation. Board of City Trusts Brief at 24–25.

The Board of City Trusts' *amicus* is Public Financial Management, Inc. ("PFM"), a national firm headquartered in Philadelphia that has been the Board of City Trusts' financial advisor since 2008. PFM warns that if property throughout the Commonwealth managed by the Board is suddenly deemed subject to local real estate taxation, the negative impact on the ability of the Board to fund Girard College and other entities under its aegis, like the Wills Eye Institute, would be significant. PFM states that the Board currently maintains approximately $110 million in debt in the form of tax free bonds, which were issued at times when the IRS determined that the Board is exempt from taxation as a governmental entity and political subdivision of the Commonwealth. According to PFM, the IRS has consistently upheld the Board's governmental status, dating at least back to 1942 and as recently as 2008. To maintain and grow the value of the Girard Trust assets, these bonds are sold, transferred, and acquired in the public market in reliance on their remaining tax free. PFM states that if the Commonwealth Court's determination stands, the IRS could well revoke the entity's tax exempt status, with the result that income received by those holding the bonds could become subject to taxation and those debt holders, in turn, could call for redemption of the bonds and seek penalties or other retributive action. PFM further notes that the uncertainty created by the current litigation has already stifled the ability of the Board to take advantage of improving market conditions in order to refinance its debt and secure longer-termed letters of credit. PFM Brief at 5–12.

The County responds that the Property is subject to local real estate taxation because it is not owned by the Board of City Trusts, but by the Girard Trust, a private nongovernmental entity; the County posits that the Property may not simply be claimed on behalf of the Board in order to take advantage

of the entity's asserted status as a governmental entity or agency. The County argues that while the Girard Trust is a charitable trust that serves public interests by funding and operating Girard College, it is not a public trust, and it is also not a governmental entity. The County views the cases cited by the Board as inapposite because those cases did not establish specifically that the Girard Trust or Girard College were governmental entities or arms or agencies of the Commonwealth for the specific purpose of local real estate taxation. According to the County, the cases prove only that the Board was deemed a state actor in its capacity as administrator of the Girard Trust and that, for Fourteenth Amendment purposes, impermissible state action occurred in the 1950s when the Orphans' Court replaced the sitting Board trustees with private individual trustees in order to keep the College segregated. County Brief at 7–13

The County's position is that it is necessary to retain some distinction between the Girard Trust and Girard College, which are not governmental entities, and the Board of City Trusts. The County relies upon *In re Milton Hershey School,* 590 Pa. 35, 911 A.2d 1258 (2006) (alumni of school funded by charitable trust did not have standing to sue for rescission of agreement made by trust, school, and Attorney General regarding management of trust assets and school) for the premise that the nature of a trust alone determines whether the trust is private or public, and not the nature of its trustees. The County echoes the Commonwealth Court's analysis that the City, as trustee of the Girard Trust, may have legal title to the assets held in trust, but this is not the same as the City actually owning the assets; equitable title to the assets, as well as any beneficial interest therein, remains with its beneficiaries: the Girard Trust and Girard College. And, the County continues, when real estate taxation is at issue, immunity or exemption determinations depend upon the real owner. The County thus cites cases that focus on ownership and control versus title or registration in the context of local taxation, including *Appeal of Board of School Directors of Owen J. Roberts School District,* 500 Pa. 465, 457 A.2d 1264

(1983) (mere registration of title in name of Commonwealth not always sufficient to establish ownership and exemption from local real estate taxation). Here, the County asserts, neither the Board of City Trusts nor the City, both of which are bound by the terms of Stephen Girard's Will, has the level of ownership and control over the Girard Trust assets to satisfy the rule the County derives from the *Roberts School District* case: any power the Board and the City may exercise over the Property is circumscribed by the instructions and conditions in Girard's Will limiting use and control of the Trust assets to the funding and operation of Girard College. County Brief at 13–20.

The County further argues that even if the Property were owned and controlled by the Board of City Trusts, immunity would still not be appropriate because the Board of City Trusts is not a Commonwealth agency. The County stresses a difference between a true Commonwealth agency and a local agency or other entity that is merely or partially "governmental in nature" and not immune. According to the County, although the Board was created by the General Assembly, and its members are appointed by the judiciary, the Board has nothing to do with either the executive or administrative government of Pennsylvania and is therefore not a Commonwealth agency. The County adds that the mere fact that the General Assembly provided the statutory method by which appointments to the Board are made does not make the Board itself a Commonwealth agency. County Brief at 21–24.

Moreover, the County asserts that the fact that the Board of City Trusts is a state actor for Fourteenth Amendment purposes or in other regards does not necessarily mean it is an immune agency in the context of local real estate taxation. This "shifting" status, the County states, is not unusual, and was addressed by this Court in a real estate taxation case involving Penn State University. *See Pennsylvania State Univ. v. Derry Tow. Sch. Dist.,* 557 Pa. 91, 731 A.2d 1272, 1274 (1999) ("The difficulty in determining the status of PSU arises from the fact that it is not merely funded by the Commonwealth, but in certain very limited respects it has governmen-

tal characteristics, while in other regards it is plainly non-governmental.... [A]n entity's status as an agency or instrumentality varies, depending on the issue for which the determination is being made."). According to the County, the Board enjoys a greater degree of autonomy from legislative oversight than this Court described as characteristic in the *Penn State* case: the Commonwealth does not fund the Board and has no actual or direct representation on it, the Board members and directors are not public officers, and the property at issue is not functionally controlled by the Commonwealth. If anything, the County asserts, the 1869 statutory scheme established the Board as an arm of the City of Philadelphia, not of the Commonwealth. County Brief at 24–30.

Finally, the County states that even if the Board of City Trusts is viewed as a Commonwealth agency, the Property does not function as Commonwealth property and is not controlled by the Commonwealth. The Property is used as an investment to generate rental income to support the private Girard charity, the County asserts, and is not being used for the sort of governmental purpose that immunizes it from local real estate taxation. The County distinguishes the "state agency" conclusions of the Third Circuit and the U.S. Supreme Court in the desegregation cases, arguing that the constitutional question in that litigation is inapposite. The County also critiques the reliance of the Board on the tort/sovereign immunity case of *Moore*. The County asserts that even if a finding of immunity for one purpose (protection from tort liability) is deemed applicable to another purpose (relief from local property taxation), *Moore* was overruled by *Burcik v. Caplen*, 805 A.2d 21 (Pa.Cmwlth.2002). County Brief at 30–38.

The County also disagrees with the Board of City Trusts' alternative assertion that the property should be deemed exempt from taxation. The County asserts that even if the Board and the City are local government entities, the use of the Property as an investment to generate rental income for Girard College is not the type of "public purpose" eligible for

exemption. To the County, the fact that the tenant is the OAG does not turn the private investment and income-generation ownership use of the Property by the Board into a public purpose. Only if the tenant function is related to the owner's function and rent is purely incidental, the County asserts, will the "public property for public purposes" exemption apply. Such "singularity of purpose with unity of consort" is not present here, the County avers, where the OAG is an outside party, of no relation to the Board, Girard Trust, or Girard College, and the rent is over $40,000 per month, which clearly is not incidental. County Brief at 39–42 (quoting *Wesleyville Borough v. Erie Cty. Bd. of Assessment Appeals*, 676 A.2d 298 (Pa.Cmwlth.1996)).

Turning to the available legislative history, the County notes that the General Assembly's goal in creating the Board of City Trusts was to remove control of the Girard Trust and College from corruptive urban political and government influence that had resulted in a dark era for the College, but not necessarily to relocate that control in the hands of the Commonwealth. Instead, the County posits that the Board was established to operate more like the private boards of trustees that manage other charitable entities. Other than appointing directors of the Board, the County adds, the Commonwealth has never been involved; nor is the City so involved. The County also avers that the Property is not exempt from taxation as the property of a "purely public charity," since it is not used solely by or in furtherance of the Girard Trust's charitable purposes. Finally, the County dismisses the Board's concerns with substantial adverse effects, arguing that it merely seeks to place the Girard Trust on equal footing with other private charitable entities. The County concludes by discounting the concerns of the Board and its *amicus* PFM that subjecting the Property to local real estate taxation will harm the Trust's ability to support and fund the College; to the County, favoring the Trust and the College affects the ability of counties and localities to provide for publicly educated students. County Brief at 42–47.

The County's *amicus*, the County Commissioners Association of Pennsylvania, echoes the County's position that although the Board of City Trusts is a "state actor" in the context of Fourteenth Amendment racial discrimination analysis, it is not thereby an agency of the Commonwealth for all purposes. The Commissioners also restate the County's point that a trust may not be characterized by the nature of its trustee; hence, even though the City is the trustee and the Board was created and empowered by the General Assembly to act for the City, the Girard Trust is essentially a private entity. County Commissioners' Brief at 8–18.

In reply, the Board of City Trusts reasserts that while it may be uniquely structured and empowered under the terms of its enabling legislation, it is clearly an instrumentality of the Commonwealth, and numerous courts have agreed with that determination rather than cabin the Board within narrow categorical limits. The Board points out that in the *Penn State* case, the university board of trustees was constituted mainly of private individuals, with only six of thirty-two trustees appointed by the Governor. By contrast, the Board asserts, through the power vested in the Philadelphia judiciary to appoint Board members, the Commonwealth retains control over the governance of the Board. The Board defends the Girard Trust as a charitable entity that is public, not private, and adds that the Girard Trust and the Board are not distinct entities having different ownership interests, but maintain "legal unity" such that the public charitable nature of the overall enterprise is shared. Board of City Trusts Reply Brief at 1–9.

### IV. Immunity From Local Real Estate Taxation

#### A. Decisional Law Background

 An arm, agency, subdivision, or municipality of the Commonwealth enjoys sovereign immunity from local real estate taxation. "Tax immunity precludes a locality from imposing taxes upon the Commonwealth and its agencies." *Lehigh–Northampton Airport Auth. v. Lehigh County Bd. of Assessment*, 585 Pa. 657, 889 A.2d 1168, 1172 n. 2 (2005).

Immunity in this context derives from the Commonwealth's sovereign right to be free of taxation unless some statutory authorization or concession to the contrary exists; this has been long settled. *Id.* at 1175; *see also Commonwealth v. Dauphin Cty.*, 335 Pa. 177, 6 A.2d 870, 872 (1939) ("The legislators did not intend to upset the orderly processes of government by allowing the sovereign power to be burdened by being subjected to municipal taxes.").[18] Property owned by the Commonwealth and its agencies and instrumentalities is presumed to be immune, with the burden on the local taxing body to demonstrate taxability. *Id.* at 1180 n. 9.

This Court has considered taxation immunity questions several times in recent decades, albeit none of the cases involve an entity remotely like the Girard Trust and College. In *Delaware County Solid Waste Authority v. Berks County Board of Assessment*, 534 Pa. 81, 626 A.2d 528 (1993), the Court addressed whether a solid waste authority in one county could claim immunity from taxation for property the authority owned in another county and maintained as a landfill. The Court concluded that the authority was an "independent agency" of the Commonwealth through analysis of its enabling legislation, the Municipal Authority Act of 1945, 53 P.S. §§ 301–322, and exercised sufficient control or "incidents of ownership" over the property, which was used for an "authorized governmental purpose," that immunity was not defeated. 626 A.2d at 531–33.

In *Pennsylvania State University v. County of Centre*, 532 Pa. 142, 615 A.2d 303 (1992) (*"Penn State I "*), the Court considered the status of the university for immunity purposes. The Court noted how the university had changed and grown since its modest origins in 1855 as a state-created institution to prepare youths to pursue occupations in agriculture; the

18. The immunity of the Commonwealth from local taxation is mirrored by the parallel tax immunity of property of the federal government. *See Kern–Limerick v. Scurlock*, 347 U.S. 110, 122, 74 S.Ct. 403, 98 L.Ed. 546 (1954) ("The doctrine of sovereign immunity is so embedded in constitutional history and practice that this Court cannot subject the Government or its official agencies to state taxation without a clear congressional mandate.").

school became a federal land grant college in 1863 and by the second half of the twentieth century derived most of its funding from the federal government, tuition, and other private sources. The Court concluded that, although the Centre County Court of Common Pleas had held in *Pennsylvania State College v. County of Centre,* (No. 2 Equity November Term 1937, filed August 24, 1939) that the university was a Commonwealth agency, that status was not etched in stone. Rather, the Court found that the immunity question presented a genuine issue of material fact to be determined at trial on remand.

Although that particular litigation did not result in a subsequent reported opinion, the question of Penn State's status as an agency or instrumentality of the Commonwealth entitled to local tax immunity arose again in *Pennsylvania State University v. Derry Township School District,* 557 Pa. 91, 731 A.2d 1272 (1999) (for convenience, *"Penn State II "*). At issue was immunity from taxation by Dauphin County of the university-owned Hershey Medical Center, which encompasses the university's medical school and teaching hospital, medical research facilities, and a children's hospital. Relying heavily on *Penn State I,* the *Penn State II* Court found that although the university remained "state-related," and was once easily a Commonwealth agency, it had become so autonomous in so many regards that it could no longer be seen as part of or controlled by the Commonwealth. The Court stressed that for certain quasi-public entities, status as an agency or instrumentality could vary, and that Commonwealth funding alone (the university then received hundreds of millions of dollars in state funds each year) did not confer agency status. The Court noted that, like regular state agencies, the university's employees were state employees who participate in the state pension plan, but unlike state agencies, the university was not subject to full compliance with the Right to Know Act. The Court reasoned that the "pivotal factor" should be "whether the institution's real property is so thoroughly under the control of the Commonwealth that, effectively, the institution's property functions as Commonwealth property." The Court

then noted that the university's real property was controlled by a board of thirty-two trustees, of which only ten represented "government" seats either held or appointed by the Commonwealth's executive branch. The Court opined that the Commonwealth did not have either functional or legal control over the university's real property, and thus, no basis existed on which the university could be deemed immune from taxation of its medical school and hospital properties. 731 A.2d at 1273–75.

In *Southeastern Pennsylvania Transportation Authority [SEPTA] v. Board of Revision of Taxes*, 574 Pa. 707, 833 A.2d 710 (2003), the Court determined that even if an entity is clearly a governmental agency or instrumentality, it may not automatically claim immunity from local real estate taxation for property leased to third-party commercial entities. The Court noted that SEPTA is part of the Commonwealth sovereign and entitled to presumed immunity; its enabling legislation also authorizes it to lease real estate in order to raise revenue and reduce expenses. Nevertheless, to the extent that SEPTA was acting as a "commercial landlord" at its headquarters building in Philadelphia, the Court held that leasing real estate to commercial tenants who were not part of or associated with SEPTA, "solely to raise revenue," was outside the scope of SEPTA'S immunity because the activity was not sufficiently connected to SEPTA'S stated purpose of providing a metropolitan public transportation system. Although the lease arrangements raised revenue and lessened the need for public funding, they were still commercial ventures not eligible for immunity: "In that respect, SEPTA is like any other commercial landlord with which it competes as a landlord." 833 A.2d at 719–20.

Two years later, in *Lehigh–Northampton Airport Authority, supra,* the Court concluded that the regional airport authority at issue was immune from local real estate taxation even though, unlike SEPTA, the authority's enabling legislation did not expressly confer Commonwealth sovereign status. The authority owned twenty-one properties: the airport itself, plus hangars, airplane parking aprons, cargo processing and

air courier facilities, federal customs and postal service facilities, and various areas used for training, maintenance, and storage. The trial court, following *Penn State II*, held that because the Commonwealth did not exercise ownership-style control over the authority's property, the authority was not immune; the Commonwealth Court affirmed. This Court reversed, however, concluding that the *Penn State* cases, which dealt with the unique and "idiosyncratic" relationship between the Commonwealth and the university, did not alter the longstanding rule expressed in *Delaware County* that property owned by a municipal authority is immune in the same manner as the sovereign Commonwealth. The *Lehigh–Northampton* Court observed that the airport authority was a creature of the Municipality Authorities Act of 1945, and expressly entitled to immunity under that legislation. 889 A.2d at 1177–80 (quoting Municipal Authorities Act, 53 Pa.C.S. § 5620: "The effectuation of the authorized purposes of authorities created under this chapter shall be for the benefit of the people of this Commonwealth.... Since authorities will be performing essential governmental functions in effectuating these purposes, authorities shall not be required to pay taxes or assessments upon property acquired or used by them for such purposes.").

From the foregoing, it is evident that in the context of immunity from local real estate taxation based on status as an agency or instrumentality of the Commonwealth, it is helpful, but not essential, to have an express declaration of Commonwealth status in enabling legislation. But, some entities may be "square pegs" that simply do not fit easily into recognized, categorical round holes; they are *sui generis*, having neither clear ancestors in law or history, nor contemporary analogs. When these circumstances arise, existing precedent and authority may be less helpful than usual. *See In re Gower's Estate*, 445 Pa. 554, 284 A.2d 742, 743 (1971) ("We believe that this particular case is [s]ui generis and that it is difficult to derive much guidance from the particular facts of cases previously decided by this Court.").

## A. The Girard Trust and College

■ In Part I of this Opinion, we reviewed: the specifics of Stephen Girard's Will, Trust, and resulting College for orphans; the fact that the City and the Commonwealth accepted Girard's public bequests and the conditions attached to them; the nature of the ensuing and enabling legislation, both at the local and state level, that followed to accommodate the conditions of the Will; and the extensive decisional law arising in connection with the Girard entities explaining, *inter alia*, why it was appropriate for municipal government to administer such a trust, and the relationship of the Commonwealth to the City in that administration. We did so in detail because the nature and history of the Trust and College provides essential background in properly identifying the Girard entities for purposes of local tax immunity and exemption. This Court's most recent decisions concerning the Girard entities are now over half a century old, and involved Fourteenth Amendment-based desegregation challenges. The majority decisions in those cases went to great lengths—over strong dissents from Justice Musmanno—to describe the entities as purely private. The first decision was summarily reversed by the U.S. Supreme Court, which held, unequivocally, that the Board of City Trusts was an agency of the Commonwealth. In the second decision, the Court majority affirmed a remarkable substitution by the Orphans' Court of "private" trustees in place of the ready, willing and able public trustees designated by Girard himself, and embodied, by virtue of a 1869 Act of the General Assembly, in the Board of City Trusts. The effect of that second decision, though not reviewed directly by the U.S. Supreme Court, was disapproved by the Third Circuit ten years later in *Brown, supra,* which held in essence that the Orphans' Court's substitution of private trustees, and this Court's affirmance of that action as against a renewed equal protection challenge, was an effort to avoid compliance with the U.S. Supreme Court's initial summary reversal. The practical effect of the Third Circuit's decision, and responsive legislation by the General Assembly effectively readopting the Act of 1869, has been to restore the *status quo ante* with

respect to the Board; it is a Commonwealth agency, at least for Fourteenth Amendment purposes.

In light of the history we have outlined, it is safe to say that the Court's majority decisions in the 1950s segregation challenges did not represent the Court's finest hour. Moreover, given the U.S. Supreme Court's summary reversal, and the eventual legislative restoration of the Board of City Trusts, we believe an assessment of the proper status of the Girard entities is not constrained by the analyses in the disapproved majority decisions in the desegregation cases.

Bringing our own independent judgment to bear, we think that the nature of the Girard entities was more accurately grasped and described in Justice Musmanno's dissenting opinions. By any measure, Stephen Girard's Will represented a remarkable act of public largesse, providing for numerous civic projects to improve the City and the Commonwealth, including but by no means limited to establishing the College. Girard's bequests helped to: develop the eastern half of the City, improve navigation, finance the police, remove buildings that were fire hazards, and establish support for the poor and infirm; all in an effort to defray some of the important costs of government. Girard's bequests addressed core municipal functions. Furthermore, Girard made clear that he named the City as trustee precisely because the government was answerable to the citizenry: "from the nature of my bequests and the benefit to result from them, I trust that my fellow citizens of Philadelphia will observe and evince special care and anxiety in selecting members of their City Councils and other agents." Girard Will, Clause XXI, ¶ 9.

Neither the City nor the Commonwealth was obliged to accept the manifold duties envisioned as a condition of Girard's public generosity, and it was not initially clear whether they properly could do so—but both governmental entities freely and immediately accepted the charge. Acquiescing in those conditions did not just entail accepting the duties of trusteeship, but the conditions also required the passage of special state legislation and city ordinances to satisfy specific conditions of the Will, including legislation—unusual, to say

the least—that made the City the guardian of the orphans attending Girard College (so as to preclude relatives from interference), and authorized the City to bind the students out as apprentices until they reached majority. Moreover, as the *Fox* Court stressed in reviewing the constitutionality of the Act creating the Board of City Trusts—a point of precedent appreciated by Justice Musmanno, but overlooked by the Court majority in both desegregation decisions—municipal entities are not empowered to accept duties of trusteeship to administer private trusts. Rather, as *Fox* noted, municipal corporations may undertake such duties of administration, and the liabilities they incur, "only as it seems for public purposes, germane to its objects." The *Fox* Court stressed that Girard's Trust, like other trusts then also managed by the City and subject to the Board of City Trusts, were appropriate for municipal management precisely because they were "germane" to the objects of municipal government: "The widening and improvement of streets and avenues, planting them with ornamental and shade trees, the education of orphans, the building of school-houses, the assistance and encouragement of young mechanics, rewarding ingenuity in the useful arts, the establishment and support of hospitals, the distribution of soup, bread or fuel to the necessitous, are objects within the general scope and purposes of the municipality." 1870 WL 8678, at *12.

The Board of City Trusts maintains that the properties it manages are immune from taxation because the General Assembly's intention in 1869 was to establish an instrumentality of the Commonwealth that would be Philadelphia-oriented and would oversee charitable assets on behalf of the City of Philadelphia, while remaining subject to Commonwealth oversight through annual reporting requirements and judicial authority over appointments to the Board. Given the intense legislative involvement of the General Assembly in providing for the operation of the Trust, culminating in its creation of the Board, we have little doubt that this is so; but that fact does not necessarily answer the question of whether the Board

was intended to be an agency of the Commonwealth for purposes of municipal tax immunity.

The simple answer to that distinct question is that the legislation creating the Board of City Trusts was not addressing tax immunity, nor has any subsequent legislation specifically addressed the matter. Part of the difficulty in this appeal arises from the fact that it is argued to us, in large part, in the usual manner of common law advocacy: the parties invoke other cases and entities, and then quite ably reason by analogy and distinction. But, the terms of the Girard Will and Trust, the acceptance of those terms by the Commonwealth and the City, the legislation passed to satisfy the terms and conditions of Girard's bequests, and the creation of the Board itself, all predate by many decades Pennsylvania decisional law respecting tax immunity for Commonwealth agencies. Indeed, the parties have cited no reported appellate cases, and our research has revealed none, involving sovereign immunity from local real estate taxation until the first half of the twentieth century. *See Commonwealth v. Dauphin County*, 6 A.2d at 872 (Pa.1939) ("The legislators did not intend to upset the orderly processes of government by allowing the sovereign power to be burdened by being subjected to municipal taxes."). There was no particular reason for the General Assembly in 1869 to directly address "agency" status for purposes of municipal taxation; such taxation was simply not an issue.

In this historical and legal landscape, it would seem to be a fool's errand to attempt to determine whether the Girard entities comprise a Commonwealth agency in the modern sense by squeezing a *sui generis* creature of the nineteenth century—when the Commonwealth itself was in its infancy—into a twentieth century (and largely late twentieth century, at that) decisional paradigm deriving from disputes concerning waste disposal sites, airports, and evolving land grant universities. It is enough, we believe, to recognize the quintessentially public nature of the bequests and the intimate, immediate, and ongoing Commonwealth governmental relationship with the Girard Entities, including the Board of City Trusts. Part

of this history also includes the facts, which are not disputed or rebutted by the County, that the Girard entities historically have not been subject to local real estate taxation, and that the Board has been deemed a Commonwealth agency for purposes of the Internal Revenue Code. We recognize, of course, that the fact that a prior challenge has not been made to the *status quo* does not mean that a challenge, once made, must fail. *See Commonwealth v. Gilmour Manuf. Co.*, 573 Pa. 143, 822 A.2d 676, 681–82 (2003). But, the historical status of the Girard entities properly gives us pause before stepping in, as a judicial matter, and rendering a decision that may well upset reliance interests and cause severe economic dislocation.

What is plainly apparent, however, is that any disruption in the status of the Girard entities, for purposes of local real estate taxation, is a matter posing questions of policy more properly assessed by the General Assembly. There is no denying that there are competing interests here. As the County notes, every dollar of property tax not paid by an entity such as Girard, which owns property within Cumberland County for the benefit of a charity operating in Philadelphia County, is a dollar that must be found elsewhere to educate the students within Cumberland County. But, this is true of all property deemed that of the Commonwealth sovereign and its agencies. Whether a Commonwealth agency such as the Board of City Trusts should properly continue to share in the immunity of the Commonwealth government is a matter that the General Assembly obviously can address and announce affirmatively. And, given the General Assembly's historical interest in, and concern with the Girard Entities, we believe it better that that policy decision be considered and decisively rendered by that body, rather than by a Court attempting to apply new doctrines to old, and rather unique, relationships.

We conclude, therefore, that the Trust, College and Board of City Trusts and, by extension, the real estate holdings of the Girard Trust, retain immunity from local property taxation as, collectively, part of the sovereignty of the Commonwealth of Pennsylvania. We therefore reverse the decision and order

of the Commonwealth Court and reinstate the order of the trial court.

## V. Exemption From Local Taxation

Our grant of allowance of appeal also included the Board of City Trusts' alternate argument that it is exempt from local real estate taxation. Given our holding above concerning sovereign immunity, we need not reach this question, and we offer no view upon it.

## VI. Conclusion

For the foregoing reasons, we reverse the decision and order of the Commonwealth Court and reinstate the order of the trial court.

Former Justice ORIE MELVIN did not participate in the decision of this case.

Justices EAKIN, TODD and McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion in which Justice BAER joins.

Justice SAYLOR, concurring.

The majority opinion is noteworthy in terms of its scope, thoroughness, and thoughtfulness concerning the creation, history, and *sui generis* character, of the Girard Trust. I find it persuasive, as well, to the degree it sets forth the basis for considering the Trust to be a Commonwealth entity, and I ultimately agree that the Commonwealth Court's order should be reversed under the circumstances.

Nevertheless, I cannot join the opinion in full, as I see no reason to depart from this Court's precedent concerning the scope of tax immunity that a Commonwealth body enjoys. Although, as the majority recognizes, the Trust was created before much of our tax-immunity and tax-exemption case law was developed, it does not follow—to my mind at least—that this circumstance provides the Trust with a blanket protection from any kind of tax-immunity analysis or any type of limita-

tion on the scope of its immunity based on the principles that have emerged from this Court's cases.

In *Lehigh–Northampton Airport Authority v. Lehigh County Board of Assessment Appeals*, 585 Pa. 657, 889 A.2d 1168 (2005), the Court observed that, although a public entity may be immune from local taxation, the scope of that immunity is limited where the entity leases some of its property "to unrelated organizations or otherwise ... acquire[s] or use[s] it for some purpose not related to the operation of the [owner's] facility." *Id.* at 673, 889 A.2d at 1178. In discussing *SEPTA v. Board of Revision of Taxes*, 574 Pa. 707, 833 A.2d 710 (2003), and *Delaware County Solid Waste Authority v. Berks County Board of Assessment Appeals*, 534 Pa. 81, 626 A.2d 528 (1993), moreover, the *Lehigh–Northampton Airport Authority* Court likewise explained that "immunity is assumed *unless the agency acts outside of its authorized governmental purposes." Lehigh–Northampton Airport Auth.*, 585 Pa. at 675, 889 A.2d at 1179 (emphasis added). As a matter of sound logic, this restriction—the emphasized language in the above-quoted sentence—should apply to any Commonwealth entity (including the Trust) regardless of when that entity came into being.

*SEPTA* is even closer to this case because it involved a Commonwealth body, the Southeastern Pennsylvania Transportation Authority, that leased part of its office space to tenants whose activities were unrelated to the performance of SEPTA's purposes. The Court determined that such leased space was taxable, reasoning that the property "is being used for something other than as part of SEPTA's operation. Very simply, SEPTA is acting as a commercial landlord, which is clearly distinct from acting as a metropolitan transportation authority[.]" *SEPTA*, 574 Pa. at 719, 833 A.2d at 717 (internal quotation marks omitted). Presently, the Girard Trust is also acting as a commercial landlord insofar as the subject property in Cumberland County is concerned. Although the tenant, unlike in *SEPTA,* is public and not commercial in nature, the public-versus-private character of the tenant is immaterial to the immunity issue since that question hinges on whether the

agency, in thus renting out the property, is acting within or outside of its own authorized purposes. *Accord Lehigh–Northampton Airport Auth.*, 585 Pa. at 675, 889 A.2d at 1179.

Here, the tenant's activities are entirely unrelated to the Girard Trust or Girard College. As such, the Trust is using the property solely to raise revenue. It follows that, pursuant to the principles set forth in this Court's precedent, the property is excluded from the scope of the Trust's immunity. Indeed, to hold otherwise, as the majority does, gives the Trust and its tenants an unfair competitive advantage, as the Trust may, in the future, lease the property to commercial enterprises at below-market rates due to its avoidance of real estate taxes. Although the Trust may have been established for beneficial public purposes, Pennsylvania's tax laws were never intended to supply it or its commercial tenants with such a windfall at the expense of county taxpayers.

With that said, I nonetheless agree that the property should not be subject to taxation under the present circumstances because it is being used for a public purpose. In particular, I would find that it is exempt, rather than immune, from taxation, *see Lehigh–Northampton Airport Auth.*, 585 Pa. at 676 n. 9, 889 A.2d at 1180 n. 9 (noting that immunity is a threshold issue, and a non-immune parcel may be tax-exempt on a separate basis), so long as the public use continues. *See* PA. CONST. art. VIII, § 2(a)(iii) (permitting the General Assembly to exempt from taxation "[t]hat portion of public property which is actually and regularly used for public purposes"); 53 Pa.C.S. § 8812(a)(8) ("The following property shall be exempt from all county, city, borough, town, township, road, poor, county institution district and school real estate taxes: ... [a]ll other public property used for public purposes...."); [1] *see also Appeal of Mun. Auth. of Borough of West View*, 381 Pa. 416, 420, 113 A.2d 307, 309 (1955) (recognizing that leased property is exempt from taxation where the lessee uses it for

1. Section 8812(a)(8) represents the 2010 recodification, in the new Consolidated County Assessment Law, of a substantively similar provision in the now-repealed Fourth to Eighth Class County Assessment Law of 1943. *See* 72 P.S. § 5453.202(a)(7) (repealed).

a public purpose). *See generally Wesleyville Borough v. Erie Cnty. Bd. of Assessment Appeals,* 676 A.2d 298, 302 (Pa. Cmwlth.1996) ("The controlling test for tax exemption is not whether the property ... has been leased out, but whether the use of the property so leased is for a public purpose.").[2] This makes a practical difference in that, under an exemption framework, the property could become taxable in the future if it is leased for a non-public use. Such a result, in my opinion, would comport with both controlling law and fundamental fairness.

Justice BAER joins this concurring opinion.

**2.** The Commonwealth Court expressed that the property is not being put to a public use regardless of the identity of the lessee because it is being used "solely as an investment property that generates rental income." *City of Phila. v. Cumberland Cnty. Bd. of Assessment Appeals,* 18 A.3d 421, 429 n. 15 (Pa.Cmwlth.2011). This position is substantially inconsistent with the cases cited above as well the discussion in *Appeal of Allegheny County,* 425 Pa. 578, 581, 229 A.2d 890, 891 (1967).