J-A12018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DANIELLE FISHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| A.O. SMITH HARVESTORE PRODUCTS, INC.; A.O. SMITH CORPORATION; A.O. SMITH  (HARVESTORE PRODUCTS); HARVESTORE SYSTEMS, T/D/B/A HARVESTORE; COLUMBIAN TEC TANK; CST INDUSTRIES, INC. AND PENN JERSEY PRODUCTS, INC. | |
| APPEAL OF CST INDUSTRIES, INC. | No. 727 EDA 2013 |

Appeal from the Order entered February 8, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No: 2011-03193

| | |
|---|---|
| DANIELLE FISHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| A.O. SMITH HARVESTORE PRODUCTS, INC.; A.O. SMITH CORPORATION; A.O. SMITH  (HARVESTORE PRODUCTS); HARVESTORE SYSTEMS, T/D/B/A HARVESTORE; COLUMBIAN TEC TANK; CST INDUSTRIES, INC. AND PENN JERSEY PRODUCTS, INC. | |
| APPEAL OF CST INDUSTRIES, INC. | No. 1960 EDA 2013 |

Appeal from the Order entered June 13, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No: 2011-03193

J-A12018-14

| | |
|---|---|
| DANIELLE FISHER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| A.O. SMITH HARVESTORE PRODUCTS, INC.; A.O. SMITH CORPORATION; A.O. SMITH  (HARVESTORE PRODUCTS); HARVESTORE SYSTEMS, T/D/B/A HARVESTORE; COLUMBIAN TEC TANK; CST INDUSTRIES, INC. AND PENN JERSEY PRODUCTS, INC. | |
| APPEAL OF A.O. SMITH CORPORATION. | No. 2000 EDA 2013 |

Appeal from the Order entered June 13, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No: 2011-03193

BEFORE:  SHOGAN, STABILE, and PLATT,[*] JJ.

MEMORANDUM BY STABILE, J.:                **FILED DECEMBER 09, 2014**

These consolidated appeals arise from two orders.  In the first, entered on February 8, 2013, the trial court accepted the settlement agreement of the above-captioned parties.  Prior to that, on January 14, 2013, the trial court denied the motion of Appellant/Cross-Appellee, CST Industries, Inc. ("CST") for summary judgment against Appellee/Cross-Appellant, A.O. Smith Corporation ("Smith").  Also on January 14, 2013, the trial court granted Smith's motion for summary judgment against CST.  CST filed a "protective appeal" from the trial court's February 8, 2013 order, believing it

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

rendered the summary judgment orders final. Meanwhile, the parties continued to litigate Smith's petition to recover counsel fees from CST.

In the second order on appeal, entered June 13, 2013, the trial court denied Smith's petition for counsel fees and denied Smith's petition to strike a portion of one of CST's briefs. Both parties appealed from that order– Smith as the aggrieved party and CST to protect itself if the February 8, 2013 order was not final.

CST argues the trial court erred in entering summary judgment against it. Smith argues the trial court erred in denying its request for counsel fees and to strike a portion of CST's brief. After careful review, we vacate the order granting summary judgment in Smith's favor and dismiss the remaining appeals as moot.

The underlying litigation commenced after plaintiff, Danielle Fisher, injured her hand while operating a roller mill manufactured by Smith. A roller mill is a corn grinding machine used in the production of animal feed. Harvestore, a former subsidiary of Smith, manufactured the involved roller mill (the "Roller Mill") in 1981. Smith and CST dispute whether CST assumed liability for the Roller Mill through a series of asset purchase agreements, or whether liability for the Roller Mill remained with Smith.

After Fisher commenced her product liability claim, Smith demanded indemnification and a defense from CST. CST declined to defend or indemnify Smith. Smith and CST filed cross claims for indemnification

against each other. The trial court granted Smith's motion for summary judgment against CST on Smith's cross claim, finding CST assumed liability for the Roller Mill and was required to indemnify Smith in connection with Fisher's products liability claims.[1] Given its success on its cross claim, Smith petitioned the trial court to enter judgment in its favor for counsel fees and expenses it incurred in defending Fisher's claims and in litigating its cross claim against CST.

We begin with CST's appeal of the trial court's order granting Smith's motion for summary judgment on Smith's cross claim. CST states the questions involved as follows:

1. Did the Court of Common Pleas err in determining at summary judgment that [Smith] acquired roller mill liabilities through multiple transactions and transferred those liabilities *sub silentio* to [CST], both of which were necessary for the trial court to find that CST had a duty to indemnify [Smith]?

2. Did the Court of Common Pleas reach its conclusions in (1) above by misapplying the principles governing contract construction, including:

   a. by failing to read the Asset Purchase Agreement in its entirety and thus not giving proper weight to the structure of assumed and excluded liabilities and the obligation to disclose potential liabilities;

   b. by concluding from the treatment of two distinguishable claims, disclosed in an exhibit to a different section of the

---

[1] Neither party moved for summary judgment on CST's cross claim for indemnity from Smith, and Fisher eventually withdrew her claims against CST.

Asset Purchase Agreement, that [CST] assumed all liabilities; and

c. by misapprehending defined terms in the Asset Purchase Agreement, including, *inter alia*, 'Division' and 'Business'?

3. Could the trial court have corrected its errors in this regard so long as there was not yet a final order on the merits?

CST's Brief on Appeal at 7-8.

The Pennsylvania Rules of Civil Procedure govern summary judgment motions as follows:

**Rule 1035.2.  Motion**

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2.  The trial court's entry of summary judgment presents a question of law, and therefore our standard of review is plenary and our scope of review is *de novo*.  **City of Philadelphia v. Cumberland Cnty. Bd. of Assessment Appeals**, 81 A.3d 24, 44 (Pa. 2013).  We will analyze the evidence of record in a light most favorable to CST, as nonmovant, and we will resolve all doubts in CST's favor in discerning the existence of a

genuine dispute of material fact. ***Daley v. A.W. Chesterton, Inc.***, 37 A.3d 1175, 1179 (Pa. 2012).

Smith argues, and the trial court found, that CST assumed liability for the Roller Mill through the following series of events. In 1996, Harvestore entered an asset purchase agreement (the "Recknell Agreement") with Recknell Industries, Ltd. ("Recknell"), whereby Recknell purchased Harvestore's line of automated products, including roller mills. Harvestore retained liabilities arising from automated products manufactured prior to the closing date of the Recknell Agreement. The parties dispute whether those retained liabilities included the Roller Mill. Smith dissolved Harvestore in 1997 and transferred its assets and liabilities to a division of Smith known as Engineered Storage Products Company ("ESPC"). CST and ESPC entered an Asset Purchase Agreement (the "APA") on December 15, 2000, whereby CST purchased ESPC's assets and certain of its liabilities. The trial court determined that Harvestore retained liability for the Roller Mill after the Recknell Agreement, and that CST assumed liability for the Roller Mill pursuant to the APA. The trial court further determined that the APA required CST to indemnify Smith for liability arising out of this action.

The parties call upon us to construe the APA and the Recknell Agreement, both of which are governed by Illinois law.

> The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. A court will first look to the language of the contract itself to determine the parties' intent. A

- 6 -

contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.

***Thompson v. Gordon***, 948 N.E.2d 39, 47 (Ill. 2011) (citations omitted).

"If the language unambiguously answers the question at issue, the inquiry is over." ***Church v. General Motors Corp.***, 74 F.3d 795, 799 (7th Cir. 1996) (applying Illinois law).

"Generally, when one corporation sells its assets to another corporation, the seller's liabilities do not become a part of the successor corporation absent an agreement providing otherwise." ***Steel Co. v. Morgan Marshall Indus.***, 662 N.E.2d 595, 599 (Ill. App. Ct. 1996). "[I]ndemnity agreements are not favored in Illinois and thus are strictly construed against the indemnitee." ***Id.***

For reference, we set forth the pertinent provisions of the Recknell Agreement and the APA, each of which we will address in detail herein. First, the Recknell Agreement:

This Asset Purchase Agreement (this "Agreement") is entered into as of September 3, 1996 between A.O. Smith Harvestore Products, Inc., a Delaware corporation, whose principal place of business is at 345 Harvestore Drive, DeKalb, Illinois, U.S.A. 60115 ("Seller") and Recknell Industries, Ltd., a Saskatchewan corporation, whose principal place of business is at 222 44th Street East, Saskatoon, Saskatchewan, Canada S7K 3L7 ("Purchaser"). Seller and Purchaser are referred to collectively herein as the "Parties."

WHEREAS, Seller, among other things, designs, manufactures, markets, supplies and sells roller mills, batch mixers and agricultural feed handling conveyors and

replacement parts for such equipment ("Automated Products") at its plant facility in DeKalb, Illinois; and

WHEREAS, Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser certain assets of Seller relating to Seller's Automated Products business, ("the Automated Products Business") upon the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the premises and the mutual promises and the representations, warranties and covenants contained in this Agreement, it is hereby agreed by the Parties as follows:

1. SALE AND PURCHASE OF ASSETS

1.1     Assets Included.     Subject to the terms and conditions of this Agreement, Seller agrees to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser hereby agrees to purchase, acquire and accept the Assets (as defined below).  The "Assets" shall consist of the following assets used by Seller in the Automated Products Business:

(a)     all machinery, storage racks, assembly tables, personal property and equipment listed in Schedule 1.1(a) attached hereto (the "Equipment");

[. . .]

1.2     Assets Not Included.  The Assets do not include:

[. . .]

(b)     Automated Products manufactured by Seller on or before September 13, 1996[.]

[. . .]

3. LIABILITIES AND OBLIGATIONS

3.1     Liabilities Retained by Seller.     All liabilities, obligations, warranties and commitments of every kind or nature whatever, whether known or unknown, liquidated or unliquidated, fixed or contingent, which in any way arise from or relate to Seller's ownership or use of the Assets, operation of the Automated Products Business, and the sale of

Automated Products manufactured on or before September 13, 1996, whenever arising, shall remain the liabilities, obligations, warranties and commitments of Seller. All such liabilities, obligations, warranties or commitments, and all such claims and demands based thereon or attributable thereto shall remain the sole obligation and responsibility of Seller. All claims, liabilities, losses and obligations retained by Seller shall be collectively referred to as "Retained Liabilities."

Recknell Agreement, 9/3/96.

The APA provides in pertinent part as follows:

### AGREEMENT FOR PURCHASE AND SALE OF ASSETS

THIS AGREEMENT (this "Agreement"), dated as of the 15th day of December, 2000, is made by and between A.O. SMITH CORPORATION, a Delaware Corporation (hereinafter "Seller"), and CST INDUSTRIES, INC., a Delaware corporation (hereinafter "Buyer").

The Seller, through its division, Engineered Storage Products Company (the "Division"), is engaged in the business of designing, engineering, manufacturing, marketing and erecting liquid and dry bulk storage tanks. The Buyer desires to purchase substantially all of the operating assets of the Division and to assume certain of the operating liabilities as specified herein, and the Seller desires to sell the Division as an ongoing business and delegate such liabilities to the Buyer, on the terms and subject to the conditions set forth in this Agreement. The term "Division" is sometimes used herein as though it were a separate entity; when so used the term means that the Seller is the entity referred to but only insofar as the activities, assets or liabilities relate to the Division and are accounted for as part of the Division's activities. The term "Business" means the business of the Division as conducted as of the date of this Agreement.

In reliance upon the representations and warranties made herein and in consideration of the mutual covenants and agreements herein contained, the Buyer and the Seller hereby agree as follows:

ARTICLE I
PURCHASE AND SALE OF ASSETS

1.1 <u>Purchase and Sale.</u> Subject to the terms and conditions contained herein, at the Closing, the Seller shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and accept from the Seller, all of Seller's right, title and interest in and to all of the assets used primarily or held for use primarily in the Division or the Business, and all tangible assets located at the Facilities (as defined in <u>Section 1.2.1</u>), as the same are more specifically set forth in <u>Section 1.2.2</u> hereof, except the Excluded Assets and Nontransferred Assets (hereinafter defined) (collectively, the "<u>Purchased Assets</u>").

1.2 <u>Definitions; Purchased Assets</u>.

1.2.1 <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings set forth below:

[. . .]

"<u>Assumed Liabilities</u>" means only the following liabilities of Seller relating to the Division, the Business or the Purchased Assets as of the Closing Date (hereinafter defined), subject to <u>Section 1.5</u> and Article XI: [. . .] (C) all liabilities in the nature of product liability, including, without limitation, any liability for claims made for injury to person, damage to property or other damage arising from, caused by or arising out of any product designed, manufactured, assembled, installed, sold, leased or licensed by the Division, prior to the Closing date[.]

[. . .]

1.4 <u>Assumed Liabilities</u>. Provided that the transactions herein contemplated are consummated, and subject to <u>Section 1.5</u> and Article XI, Buyer will assume and pay, perform and discharge when due, and will indemnify Seller against, the Assumed Liabilities and no others, except as provided herein.

1.5 <u>Excluded Liabilities</u>. Buyer shall not be responsible for any liability or obligation of Seller that is owed to or at the behest of a third party other than the Assumed Liabilities nor for any liability or obligation if and to the extent Seller has an indemnification obligation with respect thereto under Article XI (the "<u>Excluded Liabilities</u>"). Without limitation, Buyer shall not be responsible for, and the Excluded Liabilities shall include:

[. . .]

(o)    any liabilities of Seller arising out of any litigation matters identified in Exhibit 2.13, other than those maters referenced in Item 2 of Exhibit 2.13.

[. . .]

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLER

2.8    No Undisclosed Liabilities, Claims, etc.  Except [. . .] liabilities expressly disclosed in any Exhibit to this Agreement [. . .] the Division or Business has no liabilities, obligations or claims (absolute, accrued, fixed or contingent, matured or unmatured, or otherwise) that are owed to or at the behest of a third party that would constitute Assumed Liabilities, including liabilities, obligations or claims which may become known or which arise only after the Closing and which result from actions, omissions or occurrence of the Seller or the Division prior to the closing.

[. . .]

2.13  Litigation.  Except as set forth in Exhibit 2.13, there is no suit, action, investigation or proceeding pending or, to the knowledge of Seller, threatened expressly against the Seller, the Division or the Purchased Assets which, if adversely determined, would adversely affect the business, operations, earnings, properties or the financial condition of the Division nor is there any judgment , decree, injunction, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator outstanding against Seller, the Division or the Purchased Assets having, or reasonably likely to have, any such effect.

[. . .]

2.22  Products Liability.  Seller makes no representation or warranty in this Agreement as to any matters relating to product liability except in this Section 2.22.  Except as set forth in Exhibit 2.22, to the knowledge of Seller, there exists no claim against Seller in the nature of product liability, including without limitation, any claim for injury to persons, damage to property or other damage arising from, caused by or arising out of any product designed, manufactured, assembled, installed, sold, leased or licensed, or any service rendered, no reasonable basis

exists for any such claim and the Balance Sheet reserves are adequate to cover the claims disclosed in Exhibit 2.22.

APA, 12/15/00.

Exhibit 2.13 to the APA provides:

### LITIGATION

1. See Exhibit 1.5(k) and 1.5(m).

2. Litigation with respect to matters relating to product liability and product warranty is disclosed on Exhibit 2.22 and Exhibit 2.24, respectively.

3. Joest Vibratech, Inc. v. North Star Steel Company, Engineered Storage Products, et al; United States District Court, Northern District of Ohio Eastern Division; Case No. 4:00CV810.

4. A.O. Smith Engineered Storage Products Company v. Prime Systems, Inc.; Circuit Court, Pasco County, Florida; Case No. 2000 26 66 CA.

5. Lemelson Medical, Education & Research Foundation Limited Partnership v. A.O. Smith Corporation, et al; United States District Court, District of Arizona; Case No. CIV 000662 PHX SMM.

APA, Exhibit 2.13.

Finally, Exhibit 2.22 of the APA provides:

### PRODUCTS LIABILITY

1. See Exhibit 1.5(k).

2. In October 1999, two men died when they were overcome by fumes after becoming trapped in a Harvestore silo while performing maintenance work. To date, no claim has been asserted against Seller. Seller is uncertain whether it will have any liabilities relating to this incident.

3. In July 2000, one maintenance man died and two maintenance men were critically injured while working on a

sugar silo when a large mass of sugar fell. Seller had sold the silo tank to Shick-Tube for its customer, Parco Bakery. To date, no claim has been asserted against Seller. Seller is uncertain whether it will have any liabilities relating to this incident.

4. Teadit North American ("Teadit") recommended rubber gaskets to Seller for use in storage tanks being installed in the Stocker Resources project in San Luis Obispo, California. Seller placed two orders for the rubber gaskets with Teadit, which dos not manufacture the product and ordered the product from Industrial & Military Technologies. The rubber material in the gaskets disintegrated. Costs to rehabilitate the project are projected to exceed $200,000. Teadit's insurance company is reviewing Seller's claim with respect to the product.

5. William Smith v. A.O. Smith Harvestore Products, Inc.; Supreme Court, County of Jefferson, New York; Index No. 94-1687.

6. Continental Insurance Company and Pine Grove Landfill, Inc. v. Peabody TecTank, Inc. and Johnstown Construction Company; Court of Common Pleas, Schuykill [sic] County, Pennsylvania; Case No S-17-1988.

7. Rodney Woods and Janet Woods v. A.O. Smith Harvestore Products, Inc. et al; Circuit Court of the Eighth Judicial District, Pike County, Illinois; Case No. 00-L-12.

APA, Exhibit 2.22.

First we must ascertain whether Harvestore retained liability for the Roller Mill after the Recknell Agreement. If it did, then we must determine whether liability for the Roller Mill would have passed from Harvestore to ESPC and finally to CST. The Recknell Agreement includes a section titled "Assets Not Included." Recknell Agreement, § 1.2. That section defines assets not transferred from Harvestore to Recknell. Among the assets not included are "Automated Products manufactured by Seller on or before

September 13, 1996[.]" *Id.* at § 1.2(b). Correspondingly, the Recknell Agreement provides that Harverstore, as seller, retained liabilities stemming from "the sale of Automated Products manufactured on or before September 13, 1996[.]" *Id.* at § 3.1. Recknell, as purchaser, assumed liabilities arising "from the design, manufacture, marketing, and supply of Automated Products; and from the sale by Purchaser of Automated Products from and after the date of Closing[.]" *Id.* at § 3.3. Automated Products includes roller mills. *Id.* at Page 1, Paragraph 2. As noted above, the Roller Mill was manufactured and sold in 1981.

Thus, the plain language of the Recknell Agreement indicates Harvestore retained liability for the Roller Mill. CST notes, however, that no entity other than Recknell manufactured roller mills after the Recknell Agreement. CST's Brief on Appeal at 33. CST also notes that Smith's public filings after the Recknell Agreement include no references to roller mills. CST's Brief on Appeal at 25. We find these facts insignificant in light of the Recknell Agreement's plain language evincing Harvestore's continued liability for automated products manufactured prior to September 13, 1996. Moreover, the Recknell Agreement's language is in accord with Illinois law holding that sellers retain liability after a sale of assets. *See Steel Co.*, 662 N.E.2d at 599. We agree with the trial court that no issue of material fact

exists as to Harvestore's retention of liability for the Roller Mill after the Recknell Agreement.[2]

Next, we consider the APA. As we have explained, Illinois law requires a clear agreement evincing a transfer of liability from ESPC, Harvestore's successor division, to CST. *Id.* We first consider the APA's treatment of ESPC as a "division."

> [Smith], through its division, [ESPC] (the "Division"), is engaged in the business of designing, engineering, manufacturing, marketing and erecting liquid and dry bulk storage tanks. [CST] desires to purchase substantially all of the operating assets of the Division and to assume certain of the

_____

[2] The parties have gone to great lengths arguing whether the February 8 or June 13 order was the final order with regard to entry of summary judgment. They have done so because CST raised new arguments–based on the Recknell Agreement–after CST filed its appeal from the February 8 order. CST argues the February 8 order was not final and that it was entitled to raise new arguments. Smith argues the February 8 order rendered the summary judgment order final and that the trial court could not consider CST's subsequent arguments. For that reason, Smith moved to strike a portion of CST's brief that addressed entry of summary judgment in addition to the ongoing counsel fee dispute.

Given our ultimate disposition of this case, we need not address these arguments. We conclude that summary judgment was inappropriate based on the APA and not on the Recknell Agreement. We address the Recknell Agreement because Smith addressed it, indeed had to address it, in support of its motion for summary judgment. Obviously, Smith could not obtain indemnity from CST if it transferred liability for roller mills to Recknell. We will not address whether CST was late in raising additional arguments based on the Recknell agreement, as we do not consider those arguments dispositive. For purposes of this appeal, we will treat the February 8, 2013 order as the final order for purposes of the trial court's entry of summary judgment. Given CST's timely appeal from the February 8, 2013 order, there is no doubt we have jurisdiction to entertain this appeal.

operating liabilities of the Division as specified herein, and [Smith] desires to sell the Division as an ongoing business and delegate such liabilities to [CST], on the terms and subject to the conditions as set forth in this Agreement.

APA, Preamble, at ¶ 2.[3] The APA further provides: "Division" is sometimes used herein as though it were a separate legal entity; when so used the term means that [Smith] is the entity referred to but only insofar as the activities, assets or liabilities relate to the Division and are accounted for as part of the Division's activities." *Id.* "The term 'Business' means the business of the Division as conducted as of the date of this Agreement." *Id.*

To summarize so far, CST agreed to purchase the operating assets of ESPC and to assume certain specified liabilities. As of the closing date, ESPC's Business involved fabricating and selling bulk storage tanks. The question is whether liability for the Roller Mill is among the certain specified liabilities ESPC assumed.

The APA's treatment of Division is puzzling, and it renders the question before us difficult to answer. The APA purportedly defines ESPC as the Division, but also provides that the term Division refers to Smith in cases where it appears the Division is a separate legal entity. We infer that ESPC is not a separate legal entity or wholly owned subsidiary of Smith. Rather, it

_____

[3] The APA is organized in consecutively numbered sections except for three introductory paragraphs preceding the first numbered section. For clarity of citation, we will refer to these three introductory paragraphs as the Preamble.

is part of the same legal entity as Smith. Nothing in the record supports a different conclusion. As such, ESPC's assets and liabilities are technically Smith's assets and liabilities. The APA's ambiguous use of "Division" poses difficulties in discerning which liabilities Smith transferred to CST by and through ESPC.

The Preamble explains that CST will assume certain of the Division's liabilities, and § 1.2.1 of the APA defines those:

> "'Assumed Liabilities' means only the following liabilities of Seller **relating to the Division, the Business or the Purchased Assets as of the Closing Date** [. . .] (C) **all liabilities in the nature of product liability**, including, without limitation, any liability for claims made for injury to person, damage to property or other damage arising from, caused by or arising out of **any product designed, manufactured, assembled, installed, sold, leased or licensed by the Division**, prior to the Closing date.

*Id.* at § 1.2.1 (Assumed Liabilities) (underscoring in original, bolded emphasis added). Section 1.4 of the APA provides that CST "will assume and pay, perform and discharge when due, and will indemnify Seller against, the Assumed Liabilities and no others, except as provided herein." *Id.* at § 1.4.

As explained above, Harvestore retained liability for roller mills manufactured prior to the Recknell Agreement. Smith subsequently dissolved Harvestore and transferred its assets and liabilities to ESPC, though it is not clear that either Harvestore or ESPC were separate legal entities from Smith. CST argues ESPC was never in the business of

designing or manufacturing roller mills, and therefore the APA's definition of assumed liabilities does not encompass the Roller Mill. Smith argues that the APA defines "Division" more broadly than "Business," and that while ESPC was never in the business of selling roller mills, ESPC as a Division did assume roller mill liabilities from Harvestore, its predecessor.

Language in the first sentence of the Assumed Liabilities definition, "relating to the Division, the Business, or the Purchased Assets . . . ," supports Smith's argument that "Division" as used in the APA is a broader term than "Business." In other words, "Division" arguably encompasses more than the "Business" of fabricating of bulk storage tanks. Nonetheless, the definition of assumed liabilities in § 1.2.1 does not, in and of itself, establish that CST agreed to assume liability for any and all future roller mill litigation. While we agree with Smith that the Preamble and § 1.2.1 do not foreclose the possibility that CST assumed liabilities unrelated to the bulk storage tank Business, we do not believe these sections confirm that CST assumed additional liabilities. The Preamble provides only that CST will assume certain defined liabilities of the Division.

Portions of Article II of the APA, relied on by the trial court and argued extensively by the parties, do nothing to clarify the matter. Article II contains a section titled "No Undisclosed Liabilities, Claims, etc." *Id.* at § 2.8. That section provides, in relevant part, that except for:

> liabilities expressly disclosed in any Exhibit to this Agreement [. . .] the Division or Business has no liabilities,

obligations or claims (absolute, accrued, fixed or contingent, matured or unmatured, or otherwise) that are owed to or at the behest of a third party that would constitute Assumed Liabilities, **including liabilities, obligations or claims which may become known or which arise only after the Closing** and which result from actions, omissions or occurrence of the Seller or the Division prior to the closing.

*Id.* at § 2.8 (emphasis added). The APA contains several exhibits that expressly disclose pending litigation. Among those is Exhibit 2.22, which corresponds to § 2.22 of the APA. Section 2.22 is titled "Products Liability." It provides as follows:

> Seller makes no representation or warranty in this Agreement as to any matters relating to product liability except in this <u>Section 2.2</u>. Except as set forth in <u>Exhibit 2.22</u>, to the knowledge of Seller, there exists no claim against Seller in the nature of product liability, including without limitation, any claim for injury to persons, damage to property or other damage arising from, caused by or arising out of any product designed, manufactured, assembled, installed, sold, leased or licensed, or any service rendered, no reasonable basis exists for any such claim and the Balance Sheet reserves are adequate to cover the claims disclosed in <u>Exhibit 2.22</u>.

*Id.* at § 2.22 (underscoring in original).

Exhibit 2.22 is a numbered list of seven items, two of which are products liability cases involving roller mills. Based on the inclusion of two roller mill claims in Exhibit 2.22, the trial court and Smith argue that CST assumed liability for any and all such claims. We cannot agree.

We observe that Smith, not Harvestore or ESPC, is the named defendant in the roller mill claims. Moreover, § 2.22 notes that Smith set aside funding, the "Balance Sheet" reserves, sufficient to cover liabilities

arising from the matters listed in Exhibit 2.22. *Id.* at § 2.22. Thus, all we can glean from § 2.22 and Exhibit 2.22 is that CST expressly agreed to assume liability for two roller mill cases pending against Smith and that it also received sufficient balance sheet reserves to cover those liabilities. We cannot tell, based on the APA's use of the term Division and its definition of Assumed liabilities, whether CST agreed to assume liability for any future roller mill claims.

Section 1.5 of the APA, governing excluded liabilities, likewise does not sufficiently answer the question before us. That section provides: "Buyer shall not be responsible for any liability or obligation of Seller that is owed to or at the behest of a third party other than the Assumed Liabilities[.]" *Id.* at § 1.5. Section 1.5 includes an itemized list of Excluded Liabilities, one of which is "litigation matters identified in Exhibit 2.13, other than those matters referenced in Item 2 of Exhibit 2.13." *Id.* at § 1.5(o) (underscoring in original). Exhibit 2.13, in turn, contains a list of five items. Item 2 on that list refers to Exhibit 2.22. In other words, the APA carves two pending roller mill claims out of a list of otherwise excluded activities. In our view, this does not command an inference that future roller mill claims are among the defined assumed liabilities.

In summary, this appeal presents a very difficult question, and we express no opinion on the ultimate outcome of Smith's indemnification claim against CST. Nonetheless, we believe the standard of review applicable to

summary judgment orders and the law of Illinois law governing transfer of liability and indemnity agreements compel the result we have reached.

The trial court relied on the plain language of the APA, particularly the listing of two roller mill cases in Exhibit 2.22, to conclude that summary judgment in favor of Smith was appropriate. In our view, the trial court's analysis misses the mark. The ambiguous use of the term Division in the Preamble and in § 1.2.1 precludes entry of summary judgment in Smith's favor. The law of Illinois, as we explained above, requires us to construe the APA strictly against Smith, as indemnitee. *Steel Co.*, 662 N.E.2d at 599. The APA is simply not drafted clearly enough to support the trial court's conclusion that its plain language evinces a transfer of all roller mill liability from Smith to CST by and through ESPC. We therefore vacate the order of February 8, 2013 insofar as it rendered final the trial court's summary judgment order in favor of Smith. We do not disturb the remainder of that order. We remand for further proceedings on the indemnification dispute. Given our disposition of the summary judgment order we dismiss the appeals at numbers 727 and 1960 EDA 2013 as moot.

Order of February 8, 2013 affirmed in part and vacated in part. Appeal at 727 EDA 2013 dismissed as moot. Appeal at 1960 EDA dismissed as moot. Case remanded. Jurisdiction relinquished.

Judge Platt concurs in the result.

Judge Shogan files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/9/2014</u>